# Order

Michigan Supreme Court
Lansing, Michigan

December 18, 2019

159160
159201

Bridget M. McCormack,
Chief Justice

David F. Viviano,
Chief Justice Pro Tem

Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh,
Justices

*In re* HOUSE OF REPRESENTATIVES
REQUEST FOR ADVISORY OPINION
REGARDING CONSTITUTIONALITY OF
2018 PA 368 & 369                                                  SC: 159160

_____/

*In re* SENATE REQUEST FOR ADVISORY
OPINION REGARDING CONSTITUTIONALITY
OF 2018 PA 368 & 369                                          SC: 159201

_____/

On July 17, 2019, the Court heard oral argument on the requests by the House of Representatives and the Senate for an advisory opinion on the constitutionality of 2018 PA 368 and 2018 PA 369. On order of the Court, the requests are again considered, and they are DENIED, because we are not persuaded that granting the requests would be an appropriate exercise of the Court's discretion.

CLEMENT, J. (*concurring*).

I concur in the Court's order denying the Legislature's request for an advisory opinion in this matter. I believe that this Court lacks jurisdiction under Const 1963, art 3, § 8 to issue an advisory opinion after the effective date of the legislation being scrutinized, and thus must refrain from doing so here notwithstanding the observations made by Justice ZAHRA about the importance of the legal issues presented. I believe we must instead wait for an "actual controvers[y] where the stakes of the parties are committed and the issues developed in adversary proceedings." *Request for Advisory Opinion on Constitutionality of 1978 PA 33*, 402 Mich 968, 968 (1978).

## I. FACTS

The Michigan Constitution allows Michigan voters to exercise various forms of direct democracy, one of which is to initiate legislation via petitions signed by a requisite number of voters. See Const 1963, art 2, § 9. Groups known as "Michigan One Fair Wage" and "MI Time to Care" sponsored, respectively, proposals known as the "Improved Workforce Opportunity Wage Act" and the "Earned Sick Time Act." Pursuant to MCL 168.473, they filed those petitions with the Secretary of State in the summer of 2018. The Secretary of State then notified the Board of State Canvassers, MCL 168.475(1), which canvassed the petitions to determine whether an adequate number of signatures was submitted, MCL 168.476(1). The Board ultimately certified

both petitions as sufficient,[1] MCL 168.477(1), and, pursuant to Const 1963, art 2, § 9, the proposals were submitted to the Legislature. This constitutional provision required that the proposals were to "be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition [was] received by the legislature," with enactment not "subject to the veto power of the governor." The Legislature ultimately adopted both "without change or amendment" on September 5, 2018. 2018 PAs 337 and 338. Enacting them meant that they were not "submit[ted] . . . to the people for approval or rejection at the next general election." Const 1963, art 2, § 9. Had they been submitted to the people and adopted, they would only have been amendable with a three-fourths majority in the Legislature. *Id*.

After the 2018 elections, the Legislature turned its attention to these policy areas once again. Although Attorney General Frank Kelley had, several decades ago, opined that "the legislature enacting an initiative petition proposal cannot amend the law so enacted at the same legislative session," OAG, 1963-1964, No. 4,303, p 309, at 311 (March 6, 1964), a member of the Michigan Senate asked for an opinion on that issue and Attorney General Bill Schuette issued a new opinion which superseded the prior opinion and concluded that the Legislature *could* enact amendments to an initiated law during the same session at which the initiated law was itself enacted. See OAG, 2017-2018, No. 7,306, p ___ (December 3, 2018). The Legislature thereafter did adopt certain amendments to these proposals with a simple majority, which—as ordinary legislation—the Governor signed into law. See 2018 PA 368 and 369. Because neither law contained a more specific effective date, both took effect on the 91st day after the 99th Legislature adjourned *sine die*. Const 1963, art 4, § 27; *Frey v Dep't of Mgt & Budget*, 429 Mich 315, 340 (1987). The Legislature adjourned on December 28, 2018, see 2018 HCR 29,[2] so the effective date of 2018 PA 368 and 369 was March 29, 2019.

---

[1] In the case of the "Improved Workforce Opportunity Wage Act," this happened pursuant to a writ of mandamus issued by the Court of Appeals. See *Mich Opportunity v Bd of State Canvassers*, unpublished order of the Court of Appeals, entered August 22, 2018 (Docket No. 344619), lv den 503 Mich 918 (2018).

[2] Ordinarily, the date of adjournment would have been established by reference to a certificate of the Secretary of State, which state law requires to be "printed and published with the laws of the session of the legislature to which it refers . . . ." MCL 4.202. The statute alludes to the requirement that "[a]ll laws enacted at any session of the legislature shall be published in book form," Const 1963, art 4, § 35, and the implementing statute requires, among other things, this certificate, see MCL 24.1(1)(*l*). However, volumes meeting the specifications of MCL 24.1 are not in the collection of the State Law Library after the 94th Legislature.

On February 13, 2019—about a month after the convening of the 100th Legislature, see Const 1963, art 4, § 13—a member of the Michigan Senate wrote to newly elected Attorney General Dana Nessel seeking another opinion on whether 2018 PA 368 and 369 had unconstitutionally subverted the constitutional protections for initiated legislation, and a week later, both chambers of the Legislature adopted resolutions asking for this Court to issue an opinion under Const 1963, art 3, § 8. See 2019 HR 25; 2019 SR 16. On April 3, 2019, we ordered argument on whether to issue an advisory opinion. *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 503 Mich 1003 (2019). We subsequently ordered additional briefing on the question of whether this Court has jurisdiction to issue an advisory opinion after the effective date of the legislation being scrutinized. *In re House of Representatives Request for Advisory Opinion Regarding Constitutionality of 2018 PA 368 & 369*, 504 Mich 918 (2019).

## II. ANALYSIS

In my view, this Court lacks jurisdiction under our Constitution to issue an advisory opinion after the effective date of the piece of legislation being scrutinized—as is the case here. When construing the Michigan Constitution, "[o]ur primary goal . . . is to give effect to the intent of the people of the state of Michigan who ratified the Constitution, by applying the rule of 'common understanding.' " *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 323 (2015). Generally, "[w]e locate the common understanding of constitutional text by determining the plain meaning of the text as it was understood at the time of ratification," although we "also take[] account of 'the circumstances leading to the adoption of the provision and the purpose sought to be accomplished.' " *Id*. (citation omitted).[3] "The Address to the People, which was

---

[3] Justice VIVIANO faults me for "rel[ying] on extrinsic circumstances to determine the purpose of th[is] provision" and "violating a fundamental tenet of textualism," citing the writings of the late Antonin Scalia in support of his critique of my references to historical context and the Address to the People. However, it appears to me that we have *explicitly authorized* looking to "extrinsic circumstances to determine the purpose of" constitutional provisions. In *Mich Coalition of State Employee Unions*, 498 Mich at 325-326, we said that the Address to the People was "[h]ighly significant to our assessment," that "the transcript of the constitutional convention debates further confirm[ed]" our conclusion, and that "historical sources confirm[ed]" our conclusion. I believe my "interpretive approach" is consistent with Justice Scalia's. See, e.g., *Blatchford v Native Village of Noatak*, 501 US 775, 779 (1991) ("Despite the narrowness of its terms, . . . we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms . . . ."). Where, as here, the terms are not merely *narrow*, but *silent*, I believe I am just as justified in considering the materials I have consulted to discern the text's meaning.

distributed to Michigan citizens in advance of the ratification vote and which explained in everyday language what each provision of the proposed new Constitution was intended to accomplish, and, to a lesser degree, the constitutional convention debates are also relevant to understanding the ratifiers' intent." *Id*. at 323-324. I believe that all of these sources of meaning—the text of the Constitution, the circumstances leading to its adoption, and the constitutional convention proceedings (i.e., the Address to the People and the convention debates)—indicate that this Court lacks jurisdiction to issue an advisory opinion after the effective date of the legislation being reviewed.

## A. CONSTITUTIONAL TEXT

The Michigan Constitution provides that we exercise "the judicial power of the state . . . ." Const 1963, art 6, § 1. We have described that power as " 'the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction.' " *People v Richmond*, 486 Mich 29, 34 (2010), quoting *Anway v Grand Rapids R Co*, 211 Mich 592, 616 (1920). We also are limited to exercising *only* the judicial power. Const 1963, art 3, § 2. Out of respect for that limitation, we have long taken the position that courts do not "decide or declare abstract questions of right for the future guidance of suitors." *Street R Co of E Saginaw v Wildman*, 58 Mich 286, 287 (1885). It is beyond the judicial power to opine "where our conclusions could not be made effective by final judgment, decree, and process[.]" *Anway*, 211 Mich at 622. Consequently, "our only constitutional authorization to issue advisory opinions is found in Const 1963, art 3, § 8 . . . ." *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 588 n 57 (2005).

So, what does Const 1963, art 3, § 8 provide? "Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." We have recognized this text as effectively describing elements for advisory opinions. " 'Michigan's Constitution . . . restricts advisory opinions to[:] [1] important questions of "law", [2] concerning the "constitutionality" of legislation, [3] "upon solemn occasions" when requested by either house of the Legislature or the Governor, [4] after the legislation has been enacted into law but before the effective date.' " *Request for Advisory Opinion on Constitutionality of 1975 PA 227*, 395 Mich 148, 149 (1975), quoting *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 482-483 (1973) (LEVIN, J., concurring).[4] Strictly

---

[4] Justice VIVIANO asserts that "the phrase 'upon solemn occasions' . . . is a legal term of art describing the circumstances in which this Court may properly exercise its discretion to issue an advisory opinion." But the constitutional text clearly lists a "solemn occasion" as a separate element from the timing requirement; whatever effect the timing requirement has on us, it is distinct from the "solemn occasion" requirement. Thus, no one disputes that, regardless of how solemn the occasion, we cannot render an advisory

speaking, the constitutional language only empowers the Legislature to *ask* for an opinion, and it imposes certain requirements when the Legislature does so. The next question is whether the constitutional provision is bilateral—whether it applies to this Court as much as the Legislature.

There is no dispute that at least some of the provisions of Const 1963, art 3, § 8 apply to this Court as well as the Legislature. Thus, while that section does not affirmatively grant this Court the power to issue advisory opinions, there is no dispute that we can.[5] To hold that the Legislature may *ask* for an opinion but we may not *issue* one would render the constitutional text nugatory.[6] That the Legislature may only ask

opinion about some other issue than a statute's constitutionality. The quotes from the convention delegates offered by Justice VIVIANO relate to this Court looking to the "solemn occasion" language as allowing this Court *not* to render an opinion, not granting an affirmative power to do so. Notably, the several other state constitutions Justice VIVIANO cites all contain language *requiring* their state supreme courts to issue advisory opinions, and it is in this context that other state supreme courts have focused on this language to avoid rendering advisory opinions they are disinclined to issue. See Topf, *A Doubtful and Perilous Experiment: Advisory Opinions, State Constitutions, and Judicial Supremacy* (New York: Oxford University Press, 2011), p 72 ("The only qualifications [in the Maine constitutional clause requiring advisory opinions] were that the opinions be given only 'upon important questions of law' and only 'upon solemn occasions.' The qualifications became, in the six states whose provisions included them, a window of opportunity [to get around the constitutional mandate].") (citation omitted). I am aware of no authorities suggesting that the "solemn occasion" language provides independent authority that we would otherwise lack to issue an opinion, and I conclude that treating it as an element that must be satisfied distinct from the timing requirement is more consistent with the constitutional text and our statement in *Advisory Opinion on 1975 PA 227*.

[5] See Ortner, Fayz & DeQuick, Annual Survey of Michigan Law: June 1, 1989–May 31, 1990, *Civil Procedure*, 37 Wayne L Rev 373, 380 n 29 (1991) ("The authority of the supreme court to render advisory opinions is indirectly conferred by the authority granted the legislature or governor to request an advisory opinion[.]"). Because of this dynamic, I disagree with Justice VIVIANO's discussion of the "grammatical structure" of the constitutional section. Since our authority to opine is derived from the Legislature's authority to request an opinion, I am unpersuaded that the fact that the timing requirement is grammatically tied to the making of the request ought to change my analysis.

[6] We have, for that matter, also said that we may not render advisory opinions to anyone other than the Legislature or Governor. See *Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich 41, 53 (1975), quoting *Advisory Opinion re 1972 PA 294*, 389

about questions of "law" confines us to answering questions that do not require factual development.  See *Request for Advisory Opinion on the Constitutionality of 1979 PA 57*, 407 Mich 60, 66 (1979), quoting *Advisory Opinion re Constitutionality of 1974 PA 272*, 393 Mich 916 (1975) (refusing to issue an advisory opinion where "[t]he questions 'are so broad that any advisory opinion of the Court would depend for resolution on whatever particular factual situations the Court would be forced to hypothesize"").  There is also no dispute that "[t]he Court may be requested to render an advisory opinion only concerning 'the constitutionality of legislation' . . . ."  *Id*. at 67.  See also *Advisory Opinion re 1972 PA 294*, 389 Mich at 483 (LEVIN, J., concurring) ("It would appear . . . that in the context of an advisory opinion, we may not examine questions of fact, and questions concerning the interpretation or construction of a statute may not be considered except as those questions affect a constitutional question.")  We have also held that the requirement that requests for advisory opinions not come until after legislation has been enacted into law constrains both the Legislature and this Court.  *Request for Advisory Opinion on 1975 PA 227*, 395 Mich at 149-150 ("Viewed against what the Constitution requires, § 200 of 1975 PA 227 is insufficient to invoke this Court's discretionary power to render an advisory opinion. . . . [T]he request was made during the enactment process itself, whereas the Constitution requires that the request be made after enactment and before the effective date.").[7]

The question we face here is what to make of the "effective date" deadline in the Constitution.  It clearly requires the Legislature to request an advisory opinion prior to the effective date, and when it asks too late, we may not opine.  See *Request for Advisory Opinion on Constitutionality of 1975 PA 222*, 395 Mich 361, 361 (1975); *Request for Advisory Opinion on the Constitutionality of 1975 PA 195 & 196*, 395 Mich 642 (1975).  But if the Legislature must *ask* prior to the effective date, I believe we must also *opine* before the effective date.  Arguably, the resolution of this issue can be found in our discussion of the elements of advisory opinions.  We said that " 'Michigan's Constitution . . . restricts advisory opinions to . . . after the legislation has been enacted into law but before the effective date.' "  *Request for Advisory Opinion on 1975 PA 227*, 395 Mich at 149 (citation omitted).  While the question there was whether the Legislature's request

---

Mich at 485 (LEVIN, J., concurring) (" 'We are not . . . constitutionally authorized to furnish advisory opinions to the Michigan Trial Lawyers Association or a committee of the State Bar'.  Similarly, we are not constitutionally authorized to furnish advisory opinions to the Attorney General or amici.").

[7] More broadly, we have indicated that satisfaction of the timing requirements of the advisory opinion section are jurisdictional.  See *In re Request for Advisory Opinion Regarding 2005 PA 71*, 479 Mich 1, 13 (2007) ("Because the House of Representatives requested an advisory opinion well before th[e effective] date, this Court indisputably has jurisdiction . . . to render an advisory opinion in this matter.").

had been made "after [the statute] ha[d] been enacted into law"—and is therefore perhaps distinguishable from our present concern—our remark certainly came in the course of closely considering the jurisdictional consequences of the timing requirements in the advisory-opinion process, and thus may well be the sort of " 'principle[] of law deliberately examined and decided by a court of competent jurisdiction [that] should not be lightly departed,' " *People v Graves*, 458 Mich 476, 480 (1998), quoting *People v Jamieson*, 436 Mich 61, 79 (1990) (opinion by BRICKLEY, J.).  We have more clearly remarked in subsequent nonbinding dicta that the timing requirements apply to this Court.  See *Wayne Co v Hathcock*, 471 Mich 445, 485 n 98 (2004) ("The only instance in which we are constitutionally authorized to issue an advisory opinion is upon the request of either house of the Legislature or the Governor—and, then, only 'on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.' ").[8]  Regardless of how bound we ought to consider ourselves by these prior remarks of ours, I believe they are in any event correct.  I have two reasons for this conclusion.

First, I see no reason that all of the other requirements of the advisory opinion section would apply to both this Court and the Legislature, but the "before its effective

---

[8] See also *Woodman v Kera LLC*, 486 Mich 228, 264 n 2 (2010) (opinion by MARKMAN, J.) ("Const 1963, art 3, § 8, authorizes this Court to issue advisory opinions concerning the constitutionality of legislation, but . . . only after it has been enacted into law but not yet taken effect.").  Many commentators have characterized the "effective date" language as a restriction on our ability to opine.  See 22 Michigan Civil Jurisprudence, Statutes, § 125, p 710 ("The Michigan Supreme Court may render . . . an opinion as to the constitutionality of legislation after it has been enacted into law but before its effective date."); 7A Michigan Pleading & Practice (2d ed), § 52:20, p 30 ("The Constitution empowers the Supreme Court to furnish advisory opinions . . . , but only as to legislative acts that are already passed and signed by the governor, and before they become effective."); Note, *State Court Advisory Opinions: Implications for Legislative Power and Prerogatives*, 97 BU L Rev 2243, 2259 (2017) ("The Michigan Constitution . . . permits an advisory opinion to be issued only after a bill 'has been enacted into law but before its effective date.' "); *Doubtful and Perilous Experiment*, p 95 ("Michigan's constitution limits advisory opinions to advice on legislation only after it has been enacted but before its effective date."); Baughman, *Justice Moody's Lament Unanswered: Michigan's Unprincipled Retroactivity Jurisprudence*, 79 Mich BJ 664, 667 n 31 (2000) (Our authority to issue advisory opinions "may be exercised only . . . after the legislation has been enacted but before it has gone into effect . . . ."); *Civil Procedure*, 37 Wayne L Rev at 380 ("Although the Michigan constitution confers authority upon the court to render advisory opinions, that authority . . . is restricted . . . to questions concerning the constitutionality of enacted legislation that has not yet taken effect.").

date" requirement would not.[9] That the Constitution expresses any timing element at all implies restrictions on the prerogatives of the branches of government during the advisory-opinion process. Consider that—again, strictly speaking—the Constitution says only that the Legislature "may request the opinion of the supreme court . . . as to the constitutionality of legislation after it has been enacted . . . ." It does not expressly say that such a request *cannot* be made *before* legislation is enacted, for example by saying that the Legislature "may request the opinion of the supreme court . . . *only* after [the law] has been enacted." Instead, such a restriction is implied, although we have (correctly, in my view) said that it exists—and that it restrains both this Court and the Legislature.[10] See *Request for Advisory Opinion on 1975 PA 227*, 395 Mich at 149-150. The Constitution then also requires that such a request be made "before [the legislation's] effective date."[11] The implicit requirement to wait until legislation has been enacted, and the explicit requirement to ask before it takes effect, creates a window of time within which requests must be made.

I believe the existence of this window communicates limitations on both the ability to request an advisory opinion from us and our ability to render one. That the Legislature cannot ask (and we cannot opine) until the legislation is enacted appears to be aimed at requiring the Legislature to have committed to a particular course of action, leaving us out of acting as legislative counsel during the drafting process.[12] But what

---

[9] Justice MARKMAN does not believe my read of the Constitution is "even a reasonably *logical* implication of" the constitutional language, but I struggle to see the logic of accepting that all of the other requirements of the advisory-opinion process apply to both the Legislature and this Court, but that this requirement, uniquely, applies only to the Legislature. I see no textual basis for distinguishing the "before its effective date" requirement from the others.

[10] Justices MARKMAN and VIVIANO acknowledge that the Constitution requires that the Legislature wait to ask for an advisory opinion until after the legislation is enacted, but a close reading of the Constitution indicates that it no more expressly requires that than it expressly precludes us from issuing a posteffectiveness advisory opinion. Both restrictions are, instead, implied from the text and its apparent purpose.

[11] The Constitution's use of "but" in the phrase "but before [the law's] effective date," in *but*'s conjunctive sense that indicates an exception, avoids any lack of textual clarity about whether that functions as a restraint—it undoubtedly does. See *The American Heritage Dictionary of the English Language* (5th ed), defs 3 and 4 (defining "but").

[12] This apparent purpose for the text was also the stated rationale offered by the proponent of the language at the convention, future Secretary of State Richard Austin. See 1 Official Record, Constitutional Convention 1961, p 1548 ("[W]ould it be possible for us to add some language to indicate that this should be done by the supreme court

purpose is served by requiring that the request arrive before the effective date, if our opinion must not also be rendered before the effective date? If we can issue an advisory opinion after the effective date, why does the Constitution bother to expressly state that the request must arrive before then? What has changed the day after legislation takes effect such that the Legislature may not even ask but we can still opine? It seems apparent to me that the "before the effective date" deadline communicates a structural function similar to the "after it has been enacted into law" requirement.[13] In my view, that structural function is forcing the Legislature to request, and this Court to issue, an opinion before legislation takes effect, so the Legislature can remedy defects we identify.[14] Therefore, I believe the presence of the deadline for the Legislature to make the request also implies the same deadline for us to act upon it, in much the same way as the implied requirement that the Legislature not ask *before* legislation is enacted leaves us unable to opine. In other words, our ability to opine coincides with the window of time within which the Legislature can ask.[15]

---

only after the legislation has been enacted into law? This, of course, would simply prevent the supreme court from getting involved until the legislative process was completed and they would be working with a law rather than some bills or proposals for legislation.").

[13] Justice MARKMAN contends that the Constitution draws a distinction between requirements as to the "substance" of advisory opinions and the "procedural" requirement of proper timing. However, it seems apparent to me that the timing requirement—at least on the front end, requiring that we not opine until a statute is "enacted into law"—is more than procedural, but is rather substantive and structural. If that requirement is structural, I see no reason the other end of the timing requirement would not be as well.

[14] Consistent with this, one delegate remarked that he supported the proposal to add this section because "it enables us to settle questions . . . in advance without the necessity for going through all the agony of setting up [executive branch] divisions and departments and then having to dismantle them" and "it gives the legislature and the governor . . . an opportunity to get a decision *rather than* to plunge ahead regardless of what the legal outcome may be." 1 Official Record, Constitutional Convention 1961, p 1544 (emphasis added).

[15] Justice MARKMAN faults my interpretation because it imposes one "additional and applicable time restriction . . . found nowhere within the language of Const 1963, art 3, § 8 or anywhere else within our Constitution." I struggle to see why he objects to this. The word "moot" does not appear anywhere in the Constitution either, yet filing an application for leave to appeal that is timely under MCR 7.305(C) does not insulate the proceeding from being dismissed for mootness. See, e.g., *People v Givens*, 482 Mich 1072 (2008); *People v Newell*, 444 Mich 899 (1993). A party who "relied on th[e] clear and unambiguous language [of MCR 7.305(C)] in reaching the conclusion that this was

My second observation about the text of the Constitution is that I believe our extraordinary power to issue advisory opinions must be construed in light of our ordinary exercise of only the judicial power.[16] We are only *expressly* granted "the judicial power" in Const 1963, art 6, § 1—and, in fact, expressly *confined* to the judicial power, Const 1963, art 3, § 2—while our ability to issue advisory opinions is an *implicit* exception to that limitation under Const 1963, art 3, § 8. Careful consideration of the nature of our "judicial power" suggests we cannot issue advisory opinions after the effective date of the legislation being reviewed.[17] Advisory opinions are "a departure from the historic judicial scheme." *Request for Advisory Opinion on Constitutionality of 1977 PA 108*, 402 Mich 83, 86 (1977). In my view, the best way to reconcile these constitutional provisions is to conclude that advisory opinions can only be issued prior to the effective date of the legislation being scrutinized. An advisory opinion prior to the effective date of legislation is far more consistent with the nature of an advisory opinion—and therefore is in less tension with our ordinary constitutional constraint of being limited to "the

---

the only applicable time restriction" may well be sorely disappointed. Indeed, although the court rule is arguably of constitutional significance—since it is promulgated pursuant to our authority to prescribe both our own appellate jurisdiction and rules of procedure, Const 1963, art 6, §§ 4 and 5—we have not treated our ability to promulgate the rule as an opportunity to broaden the judicial power the Constitution vests us with so as to dispense with mootness as an obstacle to adjudication. Justice MARKMAN is unpersuaded by this observation because the doctrine of mootness is "well established," but it seems to me to be in the nature of a question of first impression that the answer to it is not yet well established. We have never performed this analysis before, so I am not surprised that an answer to it is not "well established." Moreover, if it is acceptable to advocate that this Court overrule itself and reinstate a rule of law it has expressly rejected, see *Ader v Delta College Bd of Trustees*, 493 Mich 887, 887-889 (2012) (MARKMAN, J., dissenting) (calling on the Court to grant leave to appeal so as to overrule *Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349 (2010)), I believe my argument that the Court ought to recognize a rule it has never before considered should not be faulted for its novelty.

[16] While Justice VIVIANO faults my analysis for discerning a rule that is not "explicitly decreed," I would note that our power to issue advisory opinions is just as "extraordinary," yet is also not "explicitly decreed."

[17] Justice MARKMAN describes the language of Const 1963, art 3, § 8 as "straightforward and unambiguous," but I disagree, at least as to this issue—because it does not expressly grant this Court the authority to issue advisory opinions (even while undoubtedly implying it), the parameters of our advisory-opinion power are not clear from the text alone given its uneasy juxtaposition with our ordinary exercise of what is essentially its antithesis, the judicial power.

judicial power"—than an advisory opinion after the effective date. Prior to the effective date, the Legislature can act on our advice to avoid the harm and confusion attendant to a statute's being found unconstitutional. After the effective date, harms have already been suffered; an abstract statement from this Court holding a law unconstitutional posteffectiveness may well introduce more confusion, rather than less, given that the issue would not be presented in the context of an actual plaintiff suffering a discrete harm that can be remedied with a court order. Consequently, I think the nature of the advisory-opinion process as a limited *exception* to our ordinary exercise of "the judicial power" means that the text of the Michigan Constitution itself suggests that advisory opinions after the effective date of legislation are not allowed.[18]

### B. THE CIRCUMSTANCES LEADING TO CONST 1963, ART 3, § 8

As noted, our caselaw establishes that where the meaning of the constitutional text is doubtful, we can supplement it with other considerations, such as the circumstances leading to the adoption of the relevant provision. Here, those circumstances also indicate that issuing such opinions after the effective date of legislation was not contemplated. While Justice Markman asserts that "expediting an answer to a question that can only be answered by this Court . . . is the very *purpose* of an advisory opinion," I believe this history demonstrates the contrary. I believe the lesson of the story is that the advisory-opinion process was not intended to provide an expeditious answer, but rather to avoid the problems that can sometimes attend to a law being held unconstitutional after it becomes effective—to enable review of a statute before any injury has been suffered.

---

[18] Justice MARKMAN disagrees with my characterization of the advisory-opinion process as a limited exception to our exercise of the judicial power and claims it instead "broaden[ed] this Court's, and this state's, 'judicial power' to also encompass the authority to issue advisory opinions . . . ." The structure of the Constitution suggests that his gloss is incorrect; while Article 6 of the Michigan Constitution lays out the parameters of the judicial power, see Const 1963, art 6, § 1 *et seq.*, the advisory-opinion process is provided for in Article 3. Moreover, we have characterized an advisory opinion as "not a judicial determination of the question by the court," *Anway*, 211 Mich at 603, as well as cited with apparent approval the remark that "[i]n no sense, even though . . . signed by five or more Justices . . . , would . . . an [advisory] opinion be or become a judicial determination," *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 461 n 1 (1973), quoting *Advisory Opinion re Constitutionality of PA 1966, No 261*, 379 Mich 55, 67 (1967), rev'd on other grounds 380 Mich 736 (1968) (BLACK, J., concurring). See also *Cassidy v McGovern*, 415 Mich 483, 498 (1982) (citing Justice BLACK's concurrence with approval); *Justice Moody's Lament*, 79 Mich BJ at 667 n 31 (Our authority to issue advisory opinions "is a special authority, not part of the judicial power . . . .").

The advisory-opinion provision was added to the Constitution in response to the fiscal and legal crises Michigan suffered in the middle decades of the 20th century relating to the sales tax. "The sales tax came to us in the depths of a great depression in order to provide the means for fulfilling desperate governmental needs." *Lockwood v Comm'r of Revenue*, 357 Mich 517, 545 (1959).

> By 1932, as a consequence of the Depression, [property] tax delinquency in Michigan had increased to frightening proportions, thus drastically reducing the yield from property tax assessments at the very time when additional monies were so desperately needed. By 1933 the delinquency rate was reported to be the highest in the country. . . . In November 1932 voters approved an amendment to the constitution that limited property taxes to no more than fifteen mills (1.5 percent) of assessed valuation.[19] This virtually forced the legislature to find new sources of revenues, because fifteen mills was inadequate to support state as well as county, township, and school programs. Thus in 1933 the legislature . . . passed [1933 PA 62,][20] an act under which property taxes would go entirely to local units of government.[21] To replace the $23.5 million the state had received from property taxes in 1932, the legislature enacted [1933 PA 167,][22] a 3 percent sales tax. [Dunbar & May, *Michigan: A History of the Wolverine State* (Grand Rapids: Wm. B. Eerdmans Publishing Co, 1995), p 523.]

However, "[t]he sales tax, powerful though it was, was vulnerable to avoidance." *Lockwood*, 357 Mich at 546.

---

[19] Const 1908, art 10, § 21, the legality of which was tested in *Pontiac Sch Dist v City of Pontiac*, 262 Mich 338 (1933). Our current Constitution contains a modified analogue. See Const 1963, art 9, § 6.

[20] This statute is, to this day (in amended form), our Property Tax Limitation Act, MCL 211.201 *et seq*.

[21] See also *Wikman v Novi*, 413 Mich 617, 688 n 66 (1982) ("After the 15-mill limitation was added to the constitution in 1932 and the Property Tax Limitation Act was enacted in 1933, the state ceased to receive a share of the tax revenues generated by the local assessment process.").

[22] This statute is, to this day (in amended form), our General Sales Tax Act, MCL 205.51 *et seq*.

> If the purchase, possibly of an automobile, were made not in Michigan but in a neighboring State the Michigan sales tax would not apply. Thus not only did the State of Michigan lose the tax moneys but a Michigan merchant lost the sale. . . . To meet the threat of avoidance a tax was enacted[, 1937 PA 94].[23] The article purchased in another State would be taxed in Michigan by virtue of its use here, and at the same rate[24] as if sold in Michigan in the first place. This was the use tax. Through its enactment the flight across the border was blocked, the Michigan merchant protected in his competitive position, and the State tax funds safeguarded. [*Id*.]

The sales and use taxes were an effective form of government finance. The sales tax "was a tax easily collected and possessing the power of producing vast revenue." *Id*. at 545. "No meal could be consumed without its payment, no shelter built, no clothing purchased without meeting its exaction, and in advance. It fell on all alike, and without regard to want or ability to bear the tax. Vast sums poured into the State treasury." *Id*. at 545-546. "It soon became our leading source of revenue," *id*. at 546-547, and "[b]y 1937 this tax was bringing in over $55 million," *Michigan*, p 523.

However, "the distribution of these funds" eventually became a problem. *Lockwood*, 357 Mich at 546. First, "an amendment added to the constitution in 1939 forbade the use of revenues derived from the gasoline and weight taxes for anything but highways."[25] *Michigan*, p 524. Second, sales tax revenues also were constitutionally restricted.

> The sales tax . . . satisfactorily met the state's needs for more than a decade. During World War II, in fact, revenues from this and other taxes had resulted in the accumulation of a sizable surplus in the state treasury. But local governmental units found themselves caught in a squeeze. Rising costs of materials as well as wages and salaries created a serious problem for them in view of the fifteen-mill tax limitation. At every legislative session mayors and school superintendents entreated the legislature for state aid. The response was meager. As a result of this situation, a constitutional amendment providing for the diversion of part of the state sales tax to local units was placed on the ballot by petition and adopted by the people in 1946.[26] [*Id*. at 551.]

---

[23] This statute is, to this day (in amended form), our Use Tax Act, MCL 205.91 *et seq*.

[24] That is to say, at the time 3%.

[25] Const 1908, art 10, § 22. Our current Constitution contains a modified analogue. See Const 1963, art 9, § 9.

[26] Const 1908, art 10, § 23, the legality of which was tested in *City of Jackson v Comm'r*

The amendment "took out of the hands of the legislature the spending of most of the 3 cents paid in." *Lockwood*, 357 Mich at 547.

> One-half of 1 cent went back to the counties and the other half to school districts. These diversions left 2 cents of the tax, but of those 2 cents almost half in turn, also was earmarked by the same amendment, leaving the legislature only a little over one-fifth of the total sales tax moneys available for distribution in its discretion. [*Id.*]

See also *Michigan*, p 551 ("At the time it was approved, it diverted some 77 percent of the state's revenues to local governmental units."). "The adoption of this 'sales tax diversion amendment' marked the beginning of a long period of financial problems and difficulties for the state government." *Id.* With "the bulk of the money . . . no longer available for the general expenses of government," "[i]t require[d] no great acuity to anticipate the next step since the path is worn smooth by constant use": "It was simply to increase the tax." *Lockwood*, 357 Mich at 547.

That avenue, however, was sealed off. "The sales tax, said our people, was not to follow this well-worn path of constant increases." *Id.* "An amendment [to Const 1908, art 10, § 23] adopted in 1954 limited the sales tax to 3 percent." *Michigan*, p 552. This prompted a fiscal crisis. "By July 1, 1958, the state treasury showed a deficit of $21.1 million. . . . The amount of the deficit increased to $95.4 million by July 1, 1959." *Id.* "On August 29 lawmakers passed a series of bills to increase tax revenues," and "[m]ain reliance was placed . . . upon [1959 PA 263,]" *id.* at 560-561. This statute amended the Use Tax Act to increase the tax to 4%, except for articles on which 3% sales tax had already been paid—for those, the use tax would be only 1%. Moreover, the statute contained "accommodation devices" whose "combined effect . . . [was] to convert the tax from one purportedly levied upon the user for his use of personal property, and to be reported and paid by him, into a tax to be collected by the seller at the point of sale and for the collection and reporting of which he, and he alone, [was] responsible." *Lockwood*, 357 Mich at 551-552. "In effect this was an addition to the 3 percent sales tax," but "[b]y calling it a use tax the legislature sought to evade the constitutional limit of 3 percent on the sales tax." *Michigan*, p 561.

In an original action for mandamus in this Court, Charles Lockwood[27] challenged the constitutionality of the 1959 use tax amendment. We took "judicial notice of what

---

*of Revenue*, 316 Mich 694 (1947). Our current Constitution contains a modified analogue. See Const 1963, art 9, § 10.

[27] Charles Lockwood, a Detroit College of Law professor, perhaps most prominently represented several service members caught up in the "Red Scare" of the 1950s and accused of being communists. His work getting Milo Radulovich reinstated in the United State Air Force is commemorated by a Michigan Legal Milestones plaque outside the

every citizen of this State kn[ew] from his daily life": "[i]n actual operation of the tax, . . . [a] tax of 4% upon retail sales [was then] being collected by retailers in every city and village and township of Michigan," leaving "[t]he citizens of this State . . . under no illusion—the tax payable by them upon their retail purchases ha[d] been increased above the 3% rate despite the prohibition in their Constitution." *Lockwood*, 357 Mich at 553-554. "[A] levy of 4% [was being] made on the sale of every loaf of bread, every pair of shoes, and every stick of furniture despite the constitutional limitation of 3%." *Id*. at 559. We held that the 1959 use-tax amendment was an unconstitutional effort to evade the constitutional sales-tax limit and ordered the state "to desist and refrain from levying, assessing or collecting the additional 1% tax . . . ." *Id*. at 560.

Although the use-tax law had an effective date of September 1, 1959, see 1959 PA 263, § 2, and we issued our opinion in *Lockwood* holding it unconstitutional on October 22, 1959, several millions of dollars of tax revenue were unconstitutionally collected in the interim. At the constitutional convention, the proponent of the advisory-opinion section of our Constitution, future Secretary of State Richard Austin, remarked:

> I am intensely interested in having a provision of this sort included in the constitution because I had quite a bit of experience with the 1959 law to increase the sales tax by way of a very peculiar means, through the use tax, to 4 per cent. Subsequently it was declared unconstitutional and there was well over $20 million of moneys collected from taxpayers in small amounts that could not be refunded to them.[28] It was collected from them unconstitutionally, but it could not be refunded to them because there were administrative problems involved. And I certainly would not like to see a recurrence of this kind of affair. . . . This would do what I think needs to be done. It would first require that both houses of the legislature pass on the legislation and even the governor sign the bill so that we do have a law which the court can rule on, at least as to the constitutionality of it, but at least give the court a chance to look at it before it becomes effective and taxes are collected under the defective law. [1 Official Record, Constitutional Convention 1961, p 1547.]

---

MSU College of Law. See State Bar of Michigan, *Milo Radulovich and the Fall of McCarthyism* <https://www.michbar.org/programs/milestone/milestones_miloradulovich> (accessed November 26, 2019) [https://perma.cc/X66W-E6T4]. See generally Ranville, *To Strike at a King: The Turning Point in the McCarthy Witch-Hunts* (Troy: Momentum Books, Ltd, 1997).

[28] Other sources offer a smaller figure. See *Michigan*, p 711 n 16 ("Although the use tax was thrown out by the courts, about $13 million had already been collected, of which amount applications were received for the refunding of only $900,000.").

The apparent problem the advisory-opinion section was trying to solve, in other words, was to *prevent the collection of unconstitutional taxes in the first place*.

In my view, then, the history of the sales- and use-tax challenge builds on the constitutional text to further demonstrate that an advisory opinion after legislation's effective date is not contemplated by the Constitution. The reason we consider the circumstances leading up to the adoption of the constitutional provision is that a "constitutional provision must receive a reasonable construction, with a view to give it effect," which focuses on identifying "the mischief designed to be remedied . . . ." *People ex rel Drake v Mahaney*, 13 Mich 481, 497 (1865).[29] The problem the advisory-opinion section was intended to solve was the one caused by *Lockwood*, but the problem there was not an insufficiently expeditious review of the statute. The case was an original action in this Court and was resolved slightly more than seven weeks after the legislation took effect.[30] Rather, the review was inadequate because the unconstitutionally collected taxes could not be returned to the taxpayers. The advisory-opinion provision was added to enable this Court to review legislation *prior to* its effective date, so that these kinds of problems could be avoided in the first place.[31]

---

[29] My analysis here does not run afoul of Justice VIVIANO's critiques of the "mischief rule." My analysis does not "*first* identify[] the problem . . . that [this constitutional provision] was designed to remedy and *then* adopt[] a construction that will suppress the problem and advance the remedy . . . ." Rather, I begin with the constitutional text, offer what I believe is the best reading of it on its own, and supplement it with consideration of the problem the convention was trying to solve. I believe Justice COOLEY would have agreed with my approach, because—notwithstanding the remark from his "seminal treatise" cited by Justice VIVIANO—Justice COOLEY also authored *Mahaney*. Moreover, in light of Justice VIVIANO's acknowledgment that this section of the Constitution "is not a model of clarity," it is not clear to me under what circumstances it would ever be appropriate to consult or make practical use of historical context if we cannot do so here.

[30] To the extent that the convention contemplated a need for prompt posteffectiveness review of legislation, it was seemingly effectuated by maintaining our original jurisdiction "to issue, hear and determine prerogative and remedial writs," Const 1963, art 6, § 4—such as the writ of mandamus that was at issue in *Lockwood* and over which we had jurisdiction under Const 1908, art 7, § 4.

[31] Justice MARKMAN concedes "that historical context may be relevant in interpreting a constitutional provision," but asserts that "even assuming that the 'purpose' of Const 1963, art 3, § 8 was to allow this Court to issue advisory opinions before the effective date of legislation, this does not signify in any way that Const 1963, art 3, § 8 does not *also* allow the Court to issue advisory opinions after the effective date." Considering this proposition standing alone, I would agree—the circumstances leading up to *Lockwood* would not, on their own, be enough to conclude that we must only be able to issue

## C. ADDRESS TO THE PEOPLE

Finally, the Address to the People also indicates that advisory opinions after the effective date of legislation are impermissible. We have described the Address to the People "as an authoritative contemporary construction of the constitutional provisions that the citizens of Michigan were asked to vote on," *Mich Coalition of State Employee Unions*, 498 Mich at 325, because "it was approved by the general convention . . . as an explanation of the proposed constitution" and "was widely disseminated prior to adoption of the constitution by vote of the people," *Regents of the Univ of Mich v Michigan*, 395 Mich 52, 60 (1975). In my view, the Address to the People confirms my interpretation of the advisory-opinion process in two ways. First, it makes clear that Mr. Austin's view of the relationship between the advisory-opinion process and the sales/use-tax controversy was not some personal idiosyncrasy. Rather, the Address said that "[a]n example of the possible exercise of th[e advisory-opinion] section would have been the matter of the 4-cent state use tax which was passed and later declared unconstitutional." 2 Official Record, Constitutional Convention 1961, p 3368. Second, and more importantly, the Address to the People flatly states that Const 1963, art 3, § 8 "empowers the supreme court to furnish advisory opinions . . . but *only* as to legislative acts that are already passed and signed by the governor, *and before they become effective*." *Id*. (emphasis added). What was communicated to the people, then, was (1) that advisory opinions could only be rendered "before [legislative acts] become effective,"[32] and (2) that the

---

advisory opinions prior to the effective date of legislation. But I do not think these circumstances must stand alone; they only supplement my read of the constitutional text, where I begin my analysis. Moreover, in light of the Constitution's silence in expressly describing the parameters of when we can issue advisory opinions, if we cannot look to this history to help make sense of that silence it is once again not clear to me under what circumstances it would ever be appropriate to consult or make practical use of historical context.

[32] Justice VIVIANO "question[s] whether" the language I find relevant in the Address to the People "is entitled to the elevated consideration normally given to the Address," given that it was not included in the proof of the Address that was mailed out to the convention delegates in advance of its approval, but was rather "inserted along with scores of other changes" that "were not mailed to the delegates until . . . four days before the Address was approved." I am, however, not aware of any principle of law that a deliberative assembly's action can be scrutinized for the amount of time spent considering it. Because "[a]ll political power is inherent in the people," Const 1963, art 1, § 1, it was the people themselves to whom the question of ratification was submitted, Const 1963, sched § 15, and our principal inquiry is therefore how " 'the great mass of the people themselves' " would understand the text, *Mich Farm Bureau v Secretary of State*, 379 Mich 387, 391 (1967), quoting *May v Topping*, 65 W Va 656, 660 (1909).

advisory-opinion process was meant to address the problem presented by *Lockwood*, which was judicial review of a statute after its effective date. This resolves any remaining doubt in my mind about how best to interpret both the constitutional text and the inferences that should be drawn from the advisory-opinion process being a response to *Lockwood*.[33]

## D. HISTORICAL PRACTICE

On the other hand, and challenging my interpretation of Const 1963, art 3, § 8, is the fact that on several occasions we have issued advisory opinions after the effective date of the legislation being assessed. However, I find this past practice unpersuasive. First, on at least one occasion, we appear to have ignored even an uncontroversial constitutional timing requirement. In *Advisory Opinion re Constitutionality of 1974 PA 242*, 394 Mich 41 (1975), we reviewed legislation which was given immediate effect on the date of enactment: July 26, 1974. Where there is no gap between a statute's date of enactment and its effective date, there is seemingly no opportunity for the Legislature to even ask (let alone for us to opine) after its enactment but before its effective date.[34] I am

---

Therefore, the central issue is the effect the Address had on the electorate to whom it was disseminated and which was invited to look to it in understanding the proposed constitution they were voting on, and what the people were told was that advisory opinions could only be rendered "before [legislative acts] become effective."

[33] I disagree with Justices MARKMAN and VIVIANO that the Address to the People contradicts the constitutional text. The Constitution expressly allows the Legislature to ask for an advisory opinion on a piece of legislation until its effective date, just as MCR 7.305(C) expressly establishes deadlines for filing an application for leave to appeal in this Court. That the expression of those deadlines does not also recite the risk of, e.g., mootness being an obstacle to adjudication does not mean that dismissal on account of mootness would be "inconsistent with [MCR 7.305(C)'s] actual language," and I do not think it contradicts the Constitution to conclude that similar obstacles to an advisory opinion exist even if not recited in Const 1963, art 3, § 8. I would note that the Address to the People's expression of the meaning of Const 1963, art 3, § 8 is a sufficiently natural gloss on the constitutional text that we echoed it in the previously quoted dicta from *Hathcock*.

[34] Our handling of 1975 PA 227 also deserves scrutiny. The Legislature asked us 10 questions about the statute, the first of which being whether it complied with the title-object requirement of Const 1963, art 4, § 24. Prior to the law's effective date, we said that the law violated this constitutional requirement, *Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1)*, 396 Mich 123 (1976), but after the effective date we went on to offer answers to the remaining questions, *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10)*, 396 Mich 465 (1975). Because

disinclined to defer to our past practice if we disregarded the Constitution's uncontroversial requirements. Second, most of the remaining posteffectiveness advisory opinions left the question of the timing of the request and the propriety of issuing a posteffectiveness opinion unaddressed.[35] This is certainly not a " 'principle[] of law deliberately examined.' " *Graves*, 458 Mich at 480 (citation omitted).

The one time we appear to have specifically concerned ourselves with whether it was too late for us to issue an advisory opinion is in *In re Request for Advisory Opinion Regarding 2005 PA 71*, 479 Mich 1 (2007). In 1996, the Legislature had amended MCL 168.523 to require that voters present a photo ID in order to vote. Attorney General Kelley, however, opined that this requirement was unconstitutional. OAG, 1997-1998, No. 6,930, p 1 (January 29, 1997). Thereafter, it went unenforced. A decade later, the Legislature adopted 2005 PA 71, which made certain other changes to MCL 168.523

---

the latter opinion came while the Legislature was drafting legislation that was responsive to our first opinion, it seems to have been in substantial tension with the goal of this Court not acting as legislative counsel.

[35] See *Advisory Opinion re Constitutionality of PA 1966, No 261 (On Reconsideration)*, 380 Mich 736, rev'g 379 Mich 55 (opinion issued on May 8, 1968, reversing opinion issued on April 10, 1967, regarding statute that took effect on March 10, 1967); *Advisory Opinion re Constitutionality of PA 1966, No 346*, 380 Mich 554, 561 (1968) (opinion issued on May 6, 1968, regarding statute that took effect on March 10, 1967); *Advisory Opinion re Constitutionality of PA 1970, No 100*, 384 Mich 82 (1970) (opinion issued on October 5, 1970, regarding statute that took effect on September 1, 1970); *Advisory Opinion re Constitutionality of 1972 PA 258*, 389 Mich 659 (1973) (opinion issued on July 24, 1973, regarding statute that took effect on January 1, 1973); *Advisory Opinion re Constitutionality of 1973 PA 1 & 2*, 390 Mich 166 (1973) (opinion issued on October 17, 1973, regarding statutes that took effect on March 13, 1973); *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10)*, 396 Mich 465 (1976) (opinion issued May 21, 1976, regarding statute that took effect on March 31, 1976); *Advisory Opinion on Constitutionality of 1976 PA 240*, 400 Mich 311, explaining 400 Mich 175 (1977) (opinion issued June 10, 1977, explaining order entered May 25, 1977, regarding statute that took effect on March 31, 1977); *Advisory Opinion on Constitutionality of 1975 PA 301*, 400 Mich 270 (1977) (opinion issued June 10, 1977, regarding statute that took effect on March 31, 1976); *Advisory Opinion on Constitutionality of 1976 PA 295, 1976 PA 297*, 401 Mich 686 (1977) (opinion issued November 7, 1977, regarding legislation that took effect on November 15, 1976); *Advisory Opinion on Constitutionality of 1982 PA 47*, 418 Mich 49 (1983) (opinion issued November 23, 1983, regarding legislation that took effect on September 19, 1982); *Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93 (1988) (opinion issued March 22, 1988, regarding legislation that took effect on February 1, 1987).

with an effective date of January 1, 2007. On February 22, 2006, the House of Representatives asked for an advisory opinion as to the constitutionality of the original photo ID requirement. 2006 HR 199. We granted the request for an opinion and asked Attorney General Michael Cox to arrange for arguing both sides of the issue. *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 474 Mich 1230 (2006). In those submissions, "the opposing Attorney General claim[ed] that this Court lack[ed] the constitutional authority to issue an advisory opinion in this case because the request for the advisory opinion was untimely." *In re 2005 PA 71*, 479 Mich at 12. We characterized the opposing Attorney General's position as being "that the effective date of 2005 PA 71 was March 31, 1997, the effective date of 1996 PA 583." *Id*. We rejected that argument, because "the effective date of 2005 PA 71 was January 1, 2007." *Id*. at 13. It was in that context that we said that, "[b]ecause the House of Representatives requested an advisory opinion well before that date, this Court indisputably ha[d] jurisdiction . . . to render an advisory opinion in this matter." *Id*. We ultimately issued an opinion holding 2005 PA 71 to be constitutional on July 18, 2007, well after its January 1, 2007 effective date.

It seems apparent to me that *In re 2005 PA 71* does not answer the question at hand. The issue presented in that case ultimately related to how to handle amendments to pre-existing statutes; our Constitution requires that "[t]he section or sections of the act altered or amended shall be re-enacted and published at length," Const 1963, art 4, § 25, so the question was whether, in "re-enact[ing] and publish[ing] [them] at length" while making an unrelated change, the Legislature could give itself another opportunity to ask for an advisory opinion. Whether our resolution of that question was right or wrong,[36] we simply did not grapple with the *current* question, which is whether advisory opinions can be issued after the effective date of the legislation. "[A]ll that is necessary for a decision to be authoritative is to show application of the judicial mind to the subject." *Detroit v Mich Pub Utilities Comm*, 288 Mich 267, 299 (1939). I do not see where "the judicial mind" was "applied" to this issue in *In re 2005 PA 71*, and I therefore do not consider it authoritative. To the extent that it has been our practice to issue posteffectiveness advisory opinions, I would "refuse to perpetuate the error" of doing so. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 219 (2007).

## III. LOOKING TO THE FUTURE

Although it is my view that this Court lacks jurisdiction to issue an advisory opinion after the effective date of the legislation being reviewed, my position lacks

---

[36] While not raised by the dissents in *In re 2005 PA 71*, it has been argued that "the advisory opinion was neither proper nor permissible" because the language being reviewed was not original to 2005 PA 71, but rather had been enacted and taken effect in 1996. *Doubtful and Perilous Experiment*, p 178.

majority support. So long as it is not the law that this Court *cannot* issue an advisory opinion under such circumstances, I do not anticipate refusing to participate in the future solely on the basis of my personal view that the Court cannot do so. However, even if my view of the jurisdictional question is not the law, the Legislature should be aware that this will inform my judgment about when it is appropriate for this Court to exercise its discretion to issue an advisory opinion. Because I do not think we should issue advisory opinions after the effective date of the legislation being scrutinized, I believe the Legislature should make every effort to give us a reasonable amount of time prior to the effective date to issue an opinion.[37]

The Legislature did not go to such efforts in this matter. The relevant legislation was passed by the Legislature on December 4, 2018. See 2018 Senate Journal 1956–1957 (No. 74, December 4, 2018). At that time, the Legislature could have extended the effective date if it wanted to. See *Gale v Oakland Co Bd of Supervisors*, 260 Mich 399, 403 (1932) ("[F]requently laws are made effective long after the 90 days provided for by the Constitution."); OAG, 1937-1938, p 111, at 112 (October 7, 1937) ("The rule is well settled that where a constitution provides . . . that all statutes shall go into effect a designated number of days after the adjournment of the session at which same are passed, the terms of such a constitution are not violated by a provision of the legislature that an

---

[37] Justice MARKMAN notes, correctly, that my view of our jurisdiction makes it impossible for "the Legislature to know how much time in advance of the effective date will be viewed by future members of this Court as sufficient[.]" Given that advisory opinions are purely discretionary on our part, however, I do not believe this adds meaningful uncertainty to the Legislature's deliberations. Under current law, the Legislature must, as Justice MARKMAN expresses it, "engage in . . . speculation" as to whether we will issue an opinion, and—had I not publicized my position—I would have been free to silently allow my view of our jurisdiction to inform my vote on whether to grant advisory-opinion requests in the future. I am simply publicizing my reasons for not issuing an opinion in light of Justice ZAHRA's forceful discussion of the importance of the issues at hand. I also question Justice MARKMAN's assertion that we have a "(discretionary) constitutional responsibility to furnish advisory opinions when these have been appropriately requested . . . ." Our advisory-opinion jurisprudence has never expressed any responsibility to opine, instead emphasizing that "the intent was for sparing resort to this mechanism" and that advisory opinions are issued "at the discretion of the Supreme Court." *Request for Advisory Opinion on 1977 PA 108*, 402 Mich at 86. Indeed, when the Governor made a request for an advisory opinion some six months after we had rejected the Legislature's request for an opinion as to the same statute, we had no compunction about once again rejecting the request, notwithstanding the even stronger signal that had been sent by our coordinate branches of government about the desire for an opinion. See *Request for Advisory Opinion on the Constitutionality of 1979 PA 57*, 407 Mich 506 (1980).

Act shall take effect at a date subsequent to the specified number of days."); Mayer, *Effective Date of Michigan Public Acts*, 56 Mich St BJ 116, 116 (1977) ("In general, a 1976 public act which was not given immediate effect will take effect on March 31, 1977, *unless* the act contains a specified effective date after March 31, 1977. In that case the act takes effect on that specified date.").[38] It did not. The legislation was signed into law by the Governor on December 13, 2018, and filed with the Secretary of State the following day. See 2018 Senate Journal 2376 (No. 81, December 19, 2018). The Legislature could have requested an advisory opinion at that time. It did not. Instead, it did not request an advisory opinion from this Court for another 10 weeks, with the House of Representatives' request arriving only five weeks before this legislation's effective date. Under these circumstances, I would be disinclined to exercise this Court's discretion to issue an advisory opinion even if I felt that we had jurisdiction to do so.[39]

## IV. CONCLUSION

I believe there are several reasons to conclude that we lack jurisdiction to issue an advisory opinion after the legislation being scrutinized has taken effect. First, I read the constitutional text as making two suggestions: (1) that the "effective date" deadline of Const 1963, art 3, § 8 is a structural element reflecting the expectation that we render advice to the Legislature before legislation takes effect, so that the Legislature can act on that advice before an injury occurs; and (2) that we are granted only "the judicial power," and limiting advisory opinions prior to the effective date of legislation is the best reconciliation of our ordinary exercise of judicial power with the implied and limited exception to that power that is the advisory-opinion process. Second, to the extent that the Michigan Constitution itself is less than perfectly clear on this, both the Address to the People and the convention debates show that the advisory-opinion process was added

---

[38] See also *Price v Hopkin*, 13 Mich 318 (1865). The legislation in *Price*, 1863 PA 227, was signed into law on March 20, 1863, and was not given immediate effect by the Legislature but had an effective date of January 1, 1864. See 1863 House Journal 1215-1216; 1863 Senate Journal 820-821. Our Constitution at the time contained a similar requirement that legislation not "take effect or be in force until the expiration of ninety days from the end of the session at which the same is passed" in the absence of a ⅔ vote, Const 1850, art 4, § 20, but that session ended on March 23, meaning that 90 days after the end of the session was well before January 1, yet we had no objection to the legislation taking effect on January 1st.

[39] This sort of equitable analysis is particularly applicable when it is the Legislature requesting an advisory opinion, given that it is the Legislature that could adjust the effective date. Although my view of the jurisdictional issue would not change, my view of the equities might if it were the Governor rather than the Legislature making the request for an advisory opinion, as allowed by Const 1963, art 3, § 8.

specifically to address problems akin to the sales/use-tax problem confronted in *Lockwood*, such that the Legislature could fix an unconstitutional law *before* it took effect to avoid implementing an unconstitutional law and ringing a bell that cannot be unrung. Third, the Address to the People squarely informed the voters who ratified the Michigan Constitution of 1963 that Const 1963, art 3, § 8 conferred on us the power to review the constitutionality of legislative acts, but "only . . . before they become effective."[40]

I would, moreover, note that the laws at issue here are very similar to the sort scrutinized in *Lockwood*—untold numbers of hours have been worked in Michigan since these laws took effect on March 29, just as untold numbers of sales occurred with the unconstitutional sales tax applied to them. An advisory opinion at this point might introduce more confusion, not less, precisely because—were the laws held unconstitutional—the effect of such a pronouncement would be highly uncertain. At least as to those hours worked prior to our opinion, there would be nothing the Legislature could do to fix the constitutional defect; yet "our conclusions could not be made effective by final judgment, decree, and process" in the absence of a discrete injury suffered by actual parties. In such a circumstance, where our advice cannot be heeded but we have no actual solution we can provide in the form of a court order or judgment, I conclude that we lack jurisdiction to act—regardless of whether the amount of time that has passed is 1 day, or 100 days. Therefore, I concur in the Court's order denying the request for an opinion.[41]

---

[40] Justice MARKMAN asserts that "historical context is not invariably relevant, much less dispositive" when "interpreting a constitutional provision . . . ." I agree, both in general and in this matter. To the extent that his remark is meant to suggest that I *do* believe it is dispositive here, that is incorrect—as noted, I think the best reading of the constitutional text alone supports my view, but I am even more confident in light of the historical context and constitutional convention materials.

[41] Justice MARKMAN decries the time this Court has taken in resolving this matter and alleges that, "had the public ever anticipated a delay of this length in responding to the requests for an advisory opinion, a private party would surely have already challenged these amendments in pursuit of a traditional 'case or controversy.' " Because "the public" does not speak with one voice, it is not clear to me how the pendency of this request for an advisory opinion has interfered with anyone filing such a suit should they so desire. In any event, I disagree that there has been an unreasonable delay. Our policy is that "[r]equests for advisory opinions receive expedited review by the Court given their time sensitive nature." MSC IOP 7.308(B)(3). Consistent with this policy, this matter was argued only five months after the request was made, at a special July session of this Court—not a month in which we ordinarily hear argument—rather than waiting until the next regular session of the Court in October, see MCR 7.301(B), and will be disposed of in less than a year. This is obviously far less time than we take on our ordinary discretionary docket, and it is less time than we took in *In re 2005 PA 71*, in which the

MCCORMACK, C.J., joins the statement of CLEMENT, J.

CAVANAGH, J. (*concurring*).

I concur in the order denying the Legislature's request for an advisory opinion. Although granted the constitutional authority to do so, this Court rarely exercises its discretion to issue an advisory opinion. I believe that the most compelling reason for this is that advisory opinions are a departure from this Court's traditional role. They are neither decisions of this Court nor binding authority on this Court or on any other branch of government. *Advisory Opinion re Constitutionality of 1972 PA 294*, 389 Mich 441, 460-461 n 1 (1973). "Requests for advisory opinions are an extraordinary exception to the typical process that brings cases to this Court. Absent are parties who have an actual stake in the outcome and a record fully developed in our lower courts." *In re 2002 PA 48 (House of Representatives' Request for an Advisory Opinion)*, 467 Mich 1203, 1203 (2002).

I find Justice CLEMENT's view of this Court's jurisdiction compelling, and I believe the textual clues and history Justice CLEMENT discusses counsel against exercising any discretion we have to issue an advisory opinion under the circumstances presented here. The Legislature's requests for an advisory opinion as to the constitutionality of 2018 PA 368 and 2018 PA 369 were made before the laws' effective date but not, I believe, sufficiently in advance of the effective date to allow this Court a

advisory opinion was issued nearly 15 months after the request was made and eight months after it was argued. It is true that we took a little less than six months to issue an advisory opinion in *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295 (2011)—apparently because that opinion was expedited so that it could be issued before the statute's effective date. Justice MARKMAN distinguishes this situation from *In re 2005 PA 71* because there we issued an opinion, while here we did not. While true, I would note that within 40 days of receiving this request we had ordered that it be briefed and argued, which left the matter pending idly for less time than in *In re Request for Advisory Opinion Regarding Constitutionality of 2016 PA 249*, 500 Mich 875 (2016) (84 days); *In re Request for Advisory Opinion Regarding Constitutionality of 2012 PA 348 and 2014 PA 349*, 494 Mich 876 (2013) (158 days); *In re Request for Advisory Opinion Regarding Constitutionality of 2002 PA 678*, 468 Mich 1213 (2003) (46 days); *In re 2002 PA 48 (House of Representatives' Request for an Advisory Opinion)*, 467 Mich 1203 (2002) (152 days); or *Request for Advisory Opinion on Constitutionality of 1989 PA 117*, 435 Mich 1243 (121 days). I trust he would prefer that we heard this matter than not, and with the delays that are a natural consequence of the heightened scrutiny that argued matters receive, I believe the Court is acting with appropriate urgency.

meaningful opportunity to carefully consider and decide the complex constitutional issues raised. Had the Legislature specified a later effective date for the laws, rather than allowing the laws to take effect *sine die*, it could have afforded the Court sufficient time to issue a decision prior to the effective date.[42] In fact, the requests could have been made as soon as the laws were enacted.[43] When the Senate and the House of Representatives requested an advisory opinion on February 20 and 21, 2019, respectively, this Court had just over one month to decide the complex constitutional question of whether the Court could and should exercise its discretion under Const 1963, art 3, § 8 and, if so, whether the "adopt-and-amend procedure" used by the Legislature was permissible under Const 1963, art 2, § 9.[44] Regardless of this Court's jurisdiction to issue an advisory opinion after the effective date of these acts, it is clear that the practical value to Michigan's citizens of such an opinion is much greater if it is issued before the laws become effective. I believe the diminished practical value of an opinion now cautions against exercise of the Court's discretion to issue an opinion.

I respectfully disagree with Justice ZAHRA that, absent this Court's rendering an advisory opinion in the manner and form presented by this case, the State's economy will suffer unique uncertainty and employers will face a quandary about whether to follow the statutes as amended or to follow the preamendment version of the laws. While there is clearly much to debate about which version of the statutes *should* be the law, there is no genuine confusion about which version of the statutes *is* the law today. Michigan's citizens follow the law. And they will, undoubtedly, continue to follow the existing laws unless and until those laws are held to be unconstitutional by order of this Court in an actual case or controversy. An advisory opinion from this Court—whether issued today

---

[42] 2018 PA 368 and 2018 PA 369 were signed into law on December 13, 2018. Because the Legislature did not establish a specific effective date for the laws, both took effect on the 91st day after the 99th Legislature adjourned *sine die*. See *Frey v Dep't of Mgt & Budget*, 429 Mich 315, 340 (1987). Accordingly, the effective date of the laws was March 29, 2019.

[43] The 100th Legislature convened on January 9, 2019. On February 20, 2019, the House of Representatives adopted a resolution requesting an advisory opinion. The Senate adopted a similar resolution the following day. Those resolutions requesting an advisory opinion on the constitutionality of 2018 PA 368 and 2018 PA 369 were not filed with this Court until February 22, 2019, and March 1, 2019, respectively.

[44] The complexity of the issues involved is evidenced by the more than 20 briefs that were filed for consideration by this Court. Indeed, the question of whether this Court possessed jurisdiction under Const 1963, art 3, § 8 was not addressed by the parties until it was raised by this Court in its July 5, 2019 order.

or before March 29, 2019—could not effect any real remedy to any citizen, be they employee or employer, actually injured by the contested laws.[45]

Finally, given that the Legislature's use of the adopt-and-amend procedure is argued to be both controversial and political, I do not find it surprising that the request for an advisory opinion is supported by members of both political parties and by proponents and opponents of the initiatives. In my view, "the current divisive political climate in which we find our state and nation" referred to in Justice ZAHRA's dissent further cautions against, rather than in favor of, this Court entering into the fray absent an actual case or controversy.

I concur in the Court's order denying the Legislature's requests.

BERNSTEIN, J., joins the statement of CAVANAGH, J.

MARKMAN, J. (*dissenting*).

Both the Michigan House of Representatives and the Michigan Senate have requested this Court's guidance concerning the constitutionality of 2018 PA 368, which amended the Improved Workforce Opportunity Wage Act, and 2018 PA 369, which amended the Earned Sick Time Act. Specifically, they have each requested that we issue an opinion addressing whether Const 1963, art 2, § 9 permits the Legislature to enact an initiative petition into law and then amend that law during the same legislative session. This is without a doubt an "important question[] of law" and one presented on a "solemn occasion[]." Const 1963, art 3, § 8. And the House and Senate made their requests "after [the legislation] ha[d] been enacted into law but before its effective date." *Id*.; see also *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 479 Mich 1, 13 (2007) ("Because the House of Representatives requested an advisory opinion well before [the effective] date, this Court indisputably has jurisdiction under art 3, § 8 to render an advisory opinion in this matter."). Thus, this Court possesses the authority-- and, in my judgment, the reasonable obligation-- to answer the question before it. Not

---

[45] I respectfully disagree with Justice MARKMAN that uncertainty over "which version of [these statutes] is going to be the law *tomorrow*" is a compelling reason for this Court to issue an advisory opinion in this matter. The constitutionality of almost every law is unsettled until this Court opines on the issue, and that uncertainty is actually part of how the law should develop. When this Court does opine on the constitutionality of a particular law, it does so in a case on review from lower courts, with a fully developed factual record and actual litigants who have suffered actual harm and for whom an actual remedy can be provided. While there may be some circumstances in which an advisory opinion is warranted despite the absence of an actual case or controversy, I do not believe those circumstances are presented here.

only should we answer the question as a matter of comity to the Legislature, but also because it presents a matter of substantial importance to the people of this state, occasioning in particular considerable uncertainty and confusion among large numbers of employers and employees of the state.[46]

---

[46] Justice CAVANAGH questions whether there is any genuine confusion and uncertainty concerning the state of the law. While she may conceivably be correct that "there is no genuine confusion about which version of the statutes is the law today," there is certainly confusion and uncertainty regarding which version is going to be the law *tomorrow*. Moreover, the people of this state, and their elected representatives, have a legitimate interest in knowing, and a right to know, which version of the statutes is going to be the law tomorrow; this Court could usefully have provided such guidance; and we have specifically been asked by a wide variety of organizations, including both houses of the Legislature, to afford this guidance. And yet we have chosen to withhold such guidance. Justice CAVANAGH asserts that uncertainty over which version of these statutes is going to be the law tomorrow is not a compelling reason for this Court to issue an advisory opinion because "[t]he constitutionality of almost every law is unsettled until this Court opines on the issue . . . ." I disagree. Laws are presumed to be constitutional. *People v Skinner*, 502 Mich 89, 111 (2018). They are not, as Justice CAVANAGH asserts, "unsettled" until they receive this Court's blessing. This case is distinctive because there are two versions of each of the statutes at issue; there are conflicting Attorney General opinions regarding the constitutionality of the adopt-and-amend procedure utilized by the Legislature in enacting these laws; and the Legislature has requested this Court to decide which of these two Attorney General opinions is correct, a request that has been supported by numerous different organizations. Justice CAVANAGH contends that "[w]hen this Court does opine on the constitutionality of a particular law, it does so in a case on review from lower courts, with a fully developed factual record and actual litigants who have suffered actual harm and for whom an actual remedy can be provided." However, the ratifiers of the 1963 Constitution have provided for an additional avenue of relief when there are "important questions of law upon solemn occasions as to the constitutionality of legislation," Const 1963, art 3, § 8-- an advisory opinion-- and Justice CAVANAGH has not explained why this is not just such an occasion.

Justice CAVANAGH also asserts that an advisory opinion issued after the effective date has a "diminished practical value" compared to one issued before the effective date. Even assuming this to be true, a post-effective-date advisory opinion would nonetheless have considerably greater "practical value" than an opinion months or even years further down the road, which is the practical alternative. Perhaps even more to the point, the Legislature and the amici are as aware as any member of this Court that an advisory opinion almost certainly could not have been rendered before the effective date and yet nonetheless they each sought an advisory opinion and presumably believed, contrary to Justice CAVANAGH, that such an opinion would still have "practical value." She further

While I respectfully differ with the Court in its decision not to issue the requested advisory opinion, I find far more troubling the Court's utter lack of urgency in communicating a response to the Legislature and to the people. It has now been 300 days since the request for an advisory opinion was first made to this Court and 155 days since oral arguments were heard.[47] Each day that passes, the confusion and uncertainty persist and, should the Court at some later juncture eventually determine the laws in question to be unconstitutional, the question of a remedy will have become increasingly more difficult. Moreover, had the public ever anticipated a delay of this length in responding to the requests for an advisory opinion, a private party would surely have already challenged these amendments in pursuit of a traditional "case or controversy." So, rather than expediting an answer to a question that can only be answered by this Court-- which is the very *purpose* of an advisory opinion-- this Court has needlessly delayed providing an answer, thus both paralyzing the legal process and confounding employers and

---

asserts in justification of her position that the sheer volume of briefs filed on behalf of the requests for an advisory opinion evidences the "complexity" of the issues involved and for that reason argues against an opinion. Respectfully, I believe that the volume of filings far *better* evidences the breadth of the perspective that there would have been considerable "practical value" to even a post-effective-date advisory opinion from this Court.

Justice CLEMENT indicates that an advisory opinion at this point may "introduce more confusion, not less, precisely because—were the laws held unconstitutional—the effect of such a pronouncement would be highly uncertain." All quite interesting, but to repeat, the Legislature has affirmatively sought our guidance on the constitutionality of two legislative acts. By that action, the Legislature was presumably of the view that this Court could have *clarified* matters rather than generated "confusion," and that it was likely to have accepted our ultimate guidance. Indeed, I am unaware of any occasion on which this Court has issued an advisory opinion concluding that legislation was unconstitutional in which the Legislature has not taken that guidance and promptly remedied the problem.

[47] Justice CLEMENT states that we have resolved this matter in "less time than we took in *In re 2005 PA 71*, in which the advisory opinion was issued nearly 15 months after the request was made and eight months after it was argued." Perhaps, however, a relevant distinction between the two matters is that in *In re 2005 PA 71*, we *granted* the request for an advisory opinion and actually answered the question presented in a 104-page opinion. Here, it has taken the Court well over nine months to *deny* the Legislature's request.

employees in search of the guidance that might have been afforded them.[48]  Because I would have answered the issue presented, and would have done so in a reasonably timely manner, I dissent.

RESPONSE TO CONCURRENCES

Justice CLEMENT has written a highly thoughtful concurrence in which she concludes that this Court lacks the authority to issue an advisory opinion after the effective date of the legislation at issue.  And Justice CAVANAGH has written a separate concurrence in which she indicates that she finds Justice CLEMENT's view "compelling."  Although Justice CAVANAGH does not indicate whether she ultimately agrees with Justice CLEMENT's conclusion, she does indicate that she believes that the "textual clues and history Justice CLEMENT discusses counsel against exercising any discretion we have to issue an advisory opinion under the circumstances presented here."  I respectfully disagree with both Justice CLEMENT and Justice CAVANAGH.

A.  TEXT AND PRECEDENT

Most importantly, I disagree because the language of Const 1963, art 3, § 8 does not contain the time limitation asserted by Justice CLEMENT.  Instead, the only time limitation contained in this provision is that the Legislature must undertake its request for an advisory opinion "after [the legislation at issue] has been enacted into law but before its effective date."  Article 3, § 8 does not contain any time limitation as to *this Court's* authority to issue an advisory opinion in response to a timely received request.  As we have explained, "it is to the words of the statute itself that a citizen first looks for guidance in directing his actions." *Robinson v Detroit*, 462 Mich 439, 467 (2000).  Similarly, it is to the words of the constitution that the Legislature first looks for guidance in directing its actions.  "This is the essence of the rule of law: to know in advance what the rules of society are." *Id*.  "Thus, if the words of the [law] are clear, the actor should be able to expect . . . that [these] will be carried out by all in society, including the courts." *Id*.  The Legislature has presumably looked to the words of Const 1963, art 3, § 8 and recognized that this provision requires only that the Legislature undertake its request for an advisory opinion after the enactment of the legislation, but before its effective date, and the Legislature-- altogether reasonably-- has relied upon this clear and

---

[48] Justice CLEMENT contends that the "advisory-opinion process was not intended to provide an expeditious answer," but instead "to enable review of a statute before any injury has been suffered."  Providing an answer "before any injury has been suffered," i.e., before the effective date of the legislation, would indeed also have provided an "expeditious answer."  Accordingly, we agree that the purpose of an advisory opinion is to provide an "expeditious answer."  She, however, believes that the purpose is a considerably narrower one than do I, to provide a *singular* kind of "expeditious answer"-- one occurring prior to the effective date of the legislation.

unambiguous language in reaching the conclusion that this was the only applicable time restriction.  In other words, it looked to the constitutional charter of this state and acted in a manner that was faithful to that charter.  Now, two members of this Court are instructing the Legislature that, unfortunately, there is an additional and applicable time restriction-- one found nowhere within the language of Const 1963, art 3, § 8 or anywhere else within our Constitution.[49]

---

[49] Justice CLEMENT contends that we should not be concerned that her new time restriction is found nowhere within our state's Constitution because, although "[t]he word 'moot' [also] does not appear anywhere in the Constitution," we nevertheless dismiss actions on the grounds of mootness.  Comparing her newly devised time restriction concerning advisory opinions with longstanding understandings of mootness (and equally, if she had chosen to do so, with similar judicial doctrines such as standing, ripeness, and justiciability) is comparing apples to oranges.  As Justice CLEMENT herself acknowledges, her new time limitation "lacks majority support" and thus is not "established," let alone "well established," legal doctrine.  Yet "[i]t *is* well established that a court will not decide moot issues." *People v Richmond*, 486 Mich 29, 34 (2010) (emphasis added).  Indeed, this Court has adhered to this principle of law for more than a century.  See, e.g., *Street R Co of E Saginaw v Wildman*, 58 Mich 286 (1885).  The principle that this Court will not decide moot issues is derived from the constitutional requirement that the judiciary is to exercise the "judicial power," Const 1963, art 6, § 1, and only the "judicial power," Const 1963, art 3, § 2.  This power has long been defined as "the right to determine actual controversies arising between adverse litigants," *Anway v Grand Rapids R Co*, 211 Mich 592, 616 (1920) (quotation marks and citation omitted), which is why the ratifiers of the 1963 Constitution were obligated to add art 3, § 8 in order to invest this Court with the authority to issue advisory opinions-- an authority not otherwise encompassed within the "judicial power."  When there is no longer an actual and pending controversy between the parties, the matter at issue has become moot, and deciding a moot issue "is not an exercise of judicial power." *Id*. at 615 (quotation marks and citation omitted).  In other words, although the word "moot" may not appear anywhere in the Constitution, the term "judicial power" *does* appear, and it is well established that this term encompasses the principle that this Court will not decide moot issues.  On the other hand, nowhere in the Constitution does it say that this Court cannot issue an advisory opinion after the effective date of legislation, and it is hardly "established," let alone "well established," that language requiring the Legislature to request an advisory opinion before the effective date of the legislation somehow encompasses the principle that this Court cannot issue an advisory opinion after the effective date of the legislation.

Furthermore, there is no grounds for Justice CLEMENT's assertion that I am somehow "fault[ing]" her legal argument "for its novelty."  "Novel" arguments, as with any other, should be assessed on the basis of their merits, and that is what I do here in suggesting

that her analogizing of her arguments in this case to those made in support of the doctrine of mootness are entirely misplaced.

Nor is Justice CLEMENT's newly devised rule even a reasonably *logical* implication of the language of art 3, § 8. That is, just because the ratifiers of the 1963 Constitution imposed a requirement on the *Legislature* to *request* an advisory opinion prior to the effective date of the legislation does not suggest in any way that the ratifiers also intended to impose a requirement on this *Court* to *issue* an advisory opinion prior to the effective date of legislation. Justice CLEMENT asks why the ratifiers would conceivably have chosen to impose this requirement on the Legislature, but not this Court. Although there is no obligation on the part of this Court either to raise or to answer this question, the answer nonetheless is quite simple-- it is far more difficult for this Court to issue an advisory opinion prior to the effective date of legislation than it is for the Legislature merely to request such an opinion. They also presumably trusted that this Court would act in a timely fashion with regard to such requests and thus did not believe that it was necessary to impose a time limitation upon this Court.

Justice CLEMENT "struggle[s] to see the logic of accepting that all of the other requirements of the advisory-opinion process apply to both the Legislature and this Court, but that [the timing] requirement, uniquely, applies only to the Legislature." However, again she is comparing apples to oranges. All of these "other requirements"-- that the request for an advisory opinion relate to an "important question of law," that it be submitted upon a "solemn occasion," and that it concern "the constitutionality of legislation"-- pertain to the *substance* of the question asked, and each requirement is obviously unaffected in any way by whether the question is being *presented* by the Legislature or being *received* by this Court; after all, it is exactly the *same* question that is at issue in either instance. By contrast, the timing requirement, unlike each of the "other requirements," is a wholly *procedural* requirement, and there is no particular reason why the same timing requirement should apply to the presenting and the receiving public bodies. That is, while it is perfectly logical to imply from the explicit requirement of the Constitution that the Legislature's request must pertain to "important questions of law upon solemn occasions as to the constitutionality of legislation" that this Court's responsive opinion must also pertain to "important questions of law upon solemn occasions as to the constitutionality of legislation," it is not equally logical to imply from the explicit requirement that the "Legislature" must request an advisory opinion before the effective date of the legislation that this Court must also issue its advisory opinion before the same date. In short, it is entirely logical-- indeed self-evident-- that the same substantive characterizations and preconditions would be applicable to the question whether the process is in the hands of the Legislature or the Court; however, no similar logic would apply to the procedural requirement here in dispute, for the Legislature and this Court stand in considerably different circumstances, not only on the basis of the

Not only is this additional time restriction absent from the language of the Constitution, but it is also absent from our state's constitutional *practice* because this Court has on numerous occasions issued advisory opinions after the effective date of the legislation at issue. See, e.g., *In re Request for Advisory Opinion Regarding 2005 PA 71*, 479 Mich 1; *Advisory Opinion on Constitutionality of 1986 PA 281*, 430 Mich 93 (1988); *Advisory Opinion on Constitutionality of 1975 PA 301*, 400 Mich 270 (1977); *Advisory Opinion re Constitutionality of PA 1966, No 346*, 380 Mich 554 (1968); *Advisory Opinion re Constitutionality of PA 1966, No 261*, 379 Mich 55 (1967), rev'd on other grounds 380 Mich 736 (1968).[50] Indeed, in *In re Request for Advisory Opinion Regarding 2005 PA 71*, 479 Mich at 13, this Court stated explicitly, "Because the House of Representatives requested an advisory opinion well before [the effective] date, this Court indisputably has jurisdiction under art 3, § 8 to render an advisory opinion in this matter." Even in the present case, in which this Court has received numerous amicus briefs, *nobody* has argued that this Court lacked the authority to issue an advisory opinion after the effective date until we raised the issue on our own and *mandated* supplemental briefing by the Attorney General on both sides of the issue. Thus, despite this additional time restriction being located nowhere within the Constitution and being altogether inconsistent with this Court's own prior practices, some members of this Court are

---

constitutional text but also on the basis of the practical obligations imposed upon each by the Constitution.

[50] Justice CLEMENT asserts that this Court has made statements in dicta in two cases-- *Request for Advisory Opinion on Constitutionality of 1975 PA 227*, 395 Mich 148, 149 (1975), and *Wayne Co v Hathcock*, 471 Mich 445, 485 n 98 (2004)-- and that I have made a statement in a concurring opinion, *Woodman v Kera LLC*, 486 Mich 228, 264 n 2 (2010), each of which may be read to suggest that an opinion from this Court must be issued before the effective date of legislation. While, in my judgment, these statements are somewhat less clear than she asserts, they are nonetheless sufficiently imprecise to render them susceptible to Justice CLEMENT's characterization, as they fail carefully to distinguish between the Legislature's *request* for an advisory opinion and this Court's *response* thereto by failing to incorporate fully within their excerpted constitutional language surrounding words necessary to a complete and contextual understanding of their meaning. However, none of these statements can be understood as anything but dictum because none of these cases pertained in any way to our authority to issue an advisory opinion after the effective date. Moreover, two of the three did not pertain to *any* aspect of procedure concerning advisory opinions or even to a request for an advisory opinion, and thus did not contain a single word of analysis concerning Const 1963, art 3, § 8. Perhaps most significantly, by the time these statements were issued, this Court had already, and without objection from any justice, exercised its authority on numerous occasions to issue advisory opinions after the effective date of the legislation.

denying the present request for an advisory opinion on the grounds that it does not satisfy this limitation.

The Legislature obviously could not have foreseen the imposition of this new restriction when it proffered the request at issue here, and future Legislatures will now have an equally difficult time determining when exactly their requests must be proffered because all we are told by the concurring justices is that these must be made sufficiently in advance of the effective date to allow this Court an opportunity to consider and decide the constitutional issues raised, and to issue an opinion before the effective date. How is the Legislature to know how much time in advance of the effective date will be viewed by future members of this Court as sufficient? Because nothing in the actual text of the Constitution requires the Legislature to engage in such speculation, I would not impose this or any other additional obligation upon the Legislature. Again, the only time restriction found within Const 1963, art 3, § 8 is that the Legislature must make its request "after [the legislation] has been enacted into law but before its effective date." That Const 1963, art 3, § 8 contains *this* restriction and no other is *itself* meaningful because "the express mention . . . of one thing implies the exclusion of other similar things," *Bradley v Saranac Community Schs Bd of Ed*, 455 Mich 285, 298 (1997), mod on other grounds by *Mich Fed of Teachers v Univ of Mich*, 481 Mich 657 (2008), and "[w]e cannot read into the [Constitution] what is not there," *AFSCME v Detroit*, 468 Mich 388, 412 (2003).

## B. PURPOSE

Justice CLEMENT concludes that the "purpose sought to be accomplished" by Const 1963, art 3, § 8 is "to enable review of a statute before any injury has been suffered," i.e., before the effective date of the statute. She explains at length her belief that the provision was "added in response" to *Lockwood v Comm'r of Revenue*, 357 Mich 517, 545 (1959), an opinion of this Court that held that the 1959 use-tax amendment represented an unconstitutional effort to evade the constitutional sales tax limit after several millions of dollars of tax revenue had been unconstitutionally collected. While I do not question this historical context, or indeed that historical context may be relevant in interpreting a constitutional provision, such context is not invariably relevant, much less dispositive, in particular where such context is *inconsistent* with the constitutional text. That is, while this context might well suggest that a "purpose" of Const 1963, art 3, § 8 was to enable this Court to issue an advisory opinion before the effective date of legislation, i.e., "to enable review of a statute before any injury has been suffered" or, even more specifically, "to prevent the collection of unconstitutional taxes in the first place," this is not the equivalent of signifying that such is the *exclusive* "purpose" to be served. Indeed, " ' "the [constitutional] remedy often extends beyond the particular act or mischief which first suggested the necessity of the law." ' " *Dist of Columbia v Heller*, 554 US 570, 578 (2008) (citations omitted); see also *id.* at 599 (noting that although the purpose of the Second Amendment was "to prevent elimination of the [state] militia," it

also by its terms protects the right to possess a firearm "as an individual right unconnected with militia service," *id*. at 582). Thus, even assuming that Justice CLEMENT is correct in her historical recitation that the "purpose" of Const 1963, art 3, § 8 was "to prevent the collection of unconstitutional taxes in the first place" by allowing this Court to issue an advisory opinion before the effective date of the legislation, that does not mean that this must be its only "purpose" or, even more significantly, that such historical context can be allowed to take *priority* over the straightforward and unambiguous language of Const 1963, art 3, § 8. Rather, it is quite possible that a constitutional provision may have multiple "purposes," and extraconstitutional sources of "history" are considerably more likely to identify "purposes" *additional* to those set forth by constitutional text than, as Justice CLEMENT suggests, to *subtract* from the "purposes" that appear clearly from constitutional text.

Furthermore, even assuming that Justice CLEMENT is correct that the purpose of this provision was to enable this Court to issue an advisory opinion before the effective date of legislation, allowing it to also issue an advisory opinion after the effective date of legislation is in no way incompatible with her discerned purpose. Before the adoption of Const 1963, art 3, § 8, this Court only possessed the "judicial power" to render an opinion in an actual case or controversy after the effective date of the legislation being challenged. The ratifiers of the 1963 Constitution decided to broaden this Court's, and this state's, "judicial power" to also encompass the authority to issue advisory opinions in certain circumstances in which the Legislature has requested an opinion in advance of the effective date of the legislation.[51] Reading Const 1963, art 3, § 8 as allowing this Court to issue an advisory opinion after the effective date of the legislation in circumstances in which the Legislature requested such an opinion before the effective date of the legislation does nothing to undermine this Court's undeniable authority to issue an advisory opinion before the effective date of the legislation. In other words, even assuming that the "purpose" of Const 1963, art 3, § 8 was to allow this Court to issue advisory opinions before the effective date of legislation, this does not signify in any way that Const 1963, art 3, § 8 does not *also* allow the Court to issue advisory opinions after the effective date. And as discussed earlier, because the only time limitation contained in the actual text of Const 1963, art 3, § 8 is that the Legislature must make its request "after [the legislation] has been enacted into law but before its effective date," that is the only time limitation I would impose. And it is the only time limitation that has *ever* been imposed by this Court under Const 1963, art 3, § 8.

---

[51] While Justice CLEMENT describes Const 1963, art 3, § 8 as creating a "limited *exception* to our ordinary exercise of the 'judicial power' " (emphasis added), I would describe it instead as *expanding* this state's conception of its own "judicial power."

## C. ADDRESS TO THE PEOPLE

Next, Justice CLEMENT relies upon the Address to the People to support her conclusion that "advisory opinions after the effective date of legislation are impermissible." In particular, the Address to the People states that Const 1963, art 3, § 8 "empowers the supreme court to furnish advisory opinions . . . but only as to legislative acts that are already passed and signed by the governor, and before they become effective." 2 Official Record, Constitutional Convention 1961, p 3368. Although the Address to the People may well be "relevant to understanding the ratifiers' intent," *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 324 (2015), it is "not controlling," and "it cannot be used to contradict . . . the constitutional text." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61 & n 26 (2018). Just as even "a prefatory clause does not limit or expand the scope of the operative clause," *Heller*, 554 US at 578, the Address to the People hardly can limit or expand the scope of the constitutional text. To emphasize, I view the Address as a highly relevant historical consideration, particularly where there is textual unclarity or ambiguity, but it is not so highly relevant that it can countermand the actual language of the Constitution, the text of which is even more highly relevant, and indeed in almost all instances is dispositive of the Constitution's meaning.[52]

Const 1963, art 3, § 8 provides that the Legislature may request an advisory opinion "after [the legislation] has been enacted into law but before its effective date." Pursuant to this language, the Legislature can request an advisory opinion the day before the effective date of the legislation. However, according to the concurring justices, the Legislature could not request an advisory opinion at that time because that would not be sufficiently in advance of the effective date to allow this Court an opportunity to consider and decide the constitutional issues raised and to issue an opinion before the effective date. Because the actual language of the Constitution allows the Legislature to request an advisory opinion up to the effective date of the legislation, we are obliged to interpret it in a consonant manner. If instead we interpret Const 1963, art 3, § 8, as does Justice CLEMENT, as prohibiting this Court from issuing an advisory opinion after the effective

---

[52] And contrary to how Justice CLEMENT apparently reads Const 1963, art 3, § 8, the silence of this provision concerning an ending date beyond which this Court cannot issue an advisory opinion, i.e., the effective date of the underlying legislation, does not give rise to an ambiguity. Rather, Const 1963, art 3, § 8 is quite clear, and unambiguous, that a legislative enactment's effective date is relevant only as to the Legislature's *request* for an opinion and that this Court is not constrained in any way by that date as an ending time for the *issuance* of an opinion. This is made clear both by the silence of Const 1963, art 3, § 8 in this regard, as well as by implications that can be reasonably and logically drawn from the provision's nonsilence as to other dates that Const 1963, art 3, § 8 has made relevant in the advisory opinion process.

date of the legislation, the Legislature would *also* be deprived of its authority to request an advisory opinion *up to* the effective date of the legislation because a request made too closely in time would be inadequate to comply with the newly discerned requirements of Const 1963, art 3, § 8. That is, even the limited "purpose" ascribed to Const 1963, art 3, § 8 by Justice CLEMENT understates the extent to which her understanding would curtail the effective ability of the Legislature or the Governor to seek an advisory opinion, by imposing upon each an obligation to engage in speculation and guesswork as to how long in advance of the effective date a request for an advisory opinion must be made and then to suffer the prospect that delays on the part of the Court itself might undo any such calculation. I will abide instead by the advisory opinion process, and its certainties, as set forth by Const 1963, art 3, § 8. The language in the Address to the People describing this provision as only allowing this Court to furnish advisory opinions before the effective date is simply inconsistent with its actual language, which accords the Legislature the authority to request an advisory opinion up to the effective date of the legislation. Because the language in the Address to the People is *not* controlling, and because the language of Const 1963, art 3, § 8 *is* controlling, I would preserve and maintain the latter.

### D. DELAYS

Finally, Justice CLEMENT's interpretation of Const 1963, art 3, § 8 would enable delays-- of the very sort that have occurred in the instant case on the part of the Court itself-- to nullify this Court's authority to affirmatively respond to requests for advisory opinions. That is, her understanding would enable the Court to avoid its (discretionary) constitutional responsibility to furnish advisory opinions when these have been appropriately requested by the Governor or the Legislature by simply doing nothing at all rather than by acting in an accountable manner and in comity with the legislative and executive branches, either to grant or to deny the request. Such delays, as I have already remarked, are particularly troubling in the context of Const 1963, art 3, § 8 because every day delayed in affording the Governor or the Legislature an answer-- affirmative or negative-- is one more day denied interested parties in pursuing an actual case or controversy.

For the reasons set forth in both Justice ZAHRA's dissenting statement and this dissenting statement, I would have affirmatively answered the instant request for an advisory opinion, and I would have done so in a far timelier manner. Thus, I respectfully dissent.

ZAHRA, J., joins the statement of MARKMAN, J.

ZAHRA, J. (*dissenting*).

I respectfully dissent from this Court's decision to deny the requests of the Michigan House of Representatives and the Michigan Senate (collectively, the Legislature) for the issuance of an opinion on the constitutionality of 2018 PA 368

(which amended the Improved Workforce Opportunity Wage Act, 2018 PA 337) and 2018 PA 369 (which amended the Earned Sick Time Act, 2018 PA 338). I would forthwith honor the requests and issue an advisory opinion addressing the constitutionality of the Legislature's action with regard to these public acts.

The Earned Sick Time Act and the Improved Workforce Opportunity Wage Act were originally proposed as initiative petitions through the people's right to exercise direct democracy.[53] After the Board of Canvassers certified the initiatives for placement on the ballot and before the ballots were printed, the Legislature enacted both acts without change.[54] Thus, the initiatives were not presented to the people for a vote in the November 2018 election. On December 13, 2018, the Governor signed bills that amended both acts. Neither act was given immediate effect. After the legislation was enacted into law but before its effective date, both the House and the Senate resolved to request an advisory opinion pursuant to Const 1963, art 3, § 8. Specifically, we are asked to opine on the constitutionality of enacting an act proposed by the initiative process and later amending that act in the same legislative session.

I would grant the Legislature's request because this is precisely the sort of important question that Const 1963, art 3, § 8 is intended to address.[55] The question presented is profoundly significant because this legislation will likely affect in one form or another nearly every Michigan resident.[56] By not addressing the Legislature's requests, employers will face a quandary about whether to follow the statutes as amended or the preamendment versions of the laws. This dilemma has resulted in uncertainty and confusion throughout a significant sector of Michigan's economy.

---

[53] Const 1963, art 2, § 9.

[54] *Id*.

[55] That provision states:

> Either house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date.

[56] The importance of the question presented is exemplified by the fact that in the current divisive political climate in which we find our state and nation, the request for an advisory opinion is supported by members of both major political parties and by both proponents and opponents of the initiatives, as well as by proponents and opponents of the changes made to the initiatives by the Legislature. The entities that have submitted amicus curiae briefs persuasively assert urgency for an opinion from this Court, maintaining that genuine confusion exists among employers regarding which versions of the laws they should follow.

Furthermore, the request for an advisory opinion has been presented "upon [a] solemn occasion[] as to the constitutionality of legislation . . . ."[57] "[I]f this Court does not issue an opinion now, but at some later time determines that one or more of the provisions of these laws is unconstitutional, the question of remedy almost certainly will have become far more difficult, with far greater potential for unfairness to the parties."[58]

Finally, a response on the Court's part would reflect the kind of comity among the branches of state government that underlies both our Constitution generally as well as Const 1963, art 3, § 8 specifically. In short, I believe that a response to the advisory opinion request in the present circumstance is exactly what is required of the highest court of our state. Such a response would clarify the validity of two laws in which confusion and uncertainty otherwise would obtain to the detriment of innumerable employers and employees across our state. Because the Legislature's advisory opinion request pertains to an "important question[] of law," it has been presented upon a "solemn occasion,"[59] and a response would alleviate the legal uncertainty and confusion Michigan now faces, I would grant this request and answer the questions presented in an expedited manner.

MARKMAN and VIVIANO, JJ., join the statement of ZAHRA, J.

VIVIANO, J. (*dissenting*).

For the reasons expressed in Justice ZAHRA's dissenting statement, I believe that this Court should issue an advisory opinion as to the constitutionality of 2018 PA 368 and 2018 PA 369. I write separately to explain why I believe this Court has discretion to do so after the effective date of the public acts in question.

The objective of interpreting a constitutional provision " 'is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.' " *People v Tanner*, 496 Mich 199, 223 (2014), quoting *Wayne Co v Hathcock*, 471 Mich 445, 468 (2004). "The first rule a court should follow in ascertaining the meaning of words in a constitution is to give effect to the plain meaning of such words as understood by the people who adopted it." *Bond v Ann Arbor Sch Dist*, 383 Mich 693, 699 (1970). We do this "by determining the plain meaning of the text as it was understood at the time of ratification," *Mich Coalition of State Employee Unions v Michigan*, 498 Mich 312, 323

---

[57] Const 1963, art 3, § 8.

[58] *In re 2002 PA 48 (House of Representatives' Request for an Advisory Opinion)*, 467 Mich 1203, 1205 (2002) (MARKMAN, J., dissenting).

[59] Const 1963, art 3, § 8.

(2015), "unless technical, legal terms are used," *id*. at 323 n 17 (quotation marks and citation omitted). "To help discover the common understanding, this Court has observed that constitutional convention debates and the address to the people, though not controlling, are relevant." *Citizens Protecting Michigan's Constitution v Secretary of State*, 503 Mich 42, 61 (2018) ("The primary rule is that of common understanding . . . .") (quotation marks and citations omitted). "However, such extrinsic evidence can hardly be used to contradict the unambiguous language of the constitution." *Nat'l Pride At Work, Inc v Governor*, 481 Mich 56, 80 (2008).

Article 3, § 8 of our Constitution provides that "[e]ither house of the legislature or the governor may request the opinion of the supreme court on important questions of law upon solemn occasions as to the constitutionality of legislation after it has been enacted into law but before its effective date." As Justice CLEMENT notes, Const 1963, art 3, § 8 "does not affirmatively grant this Court the power to issue advisory opinions . . . ." *Ante* at 5 (CLEMENT, J., concurring). Instead, this Court's power to issue advisory opinions is rather obviously implied from the text. The provision is not a model of clarity, but that does not relieve us of our obligation to determine its original meaning, i.e., "the meaning the words and phrases of the [provision] would have had, in context, to ordinary readers, speakers, and writers of the English language, reading a document of this type, at the time adopted[.]" Kesavan & Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 Geo LJ 1113, 1118 (2003).

To determine whether the Court has discretion to issue an advisory opinion after the effective date of those acts, two phrases from Article 3, § 8 must be examined. Both phrases generally relate to when an advisory opinion may be requested and thus, impliedly, when one may properly be issued by the Court. The first of these phrases relates to the circumstances in which an advisory opinion may be requested: "upon solemn occasions." This phrase has not been construed by our Court; however, it has been construed by our sister state courts both before and after it was adopted in Michigan. Understanding the original meaning of this phrase is key to a proper understanding of the scope of the Court's advisory opinion power.

At the time of the constitutional convention for Michigan's 1963 Constitution, the phrase "upon solemn occasions" appeared in the state constitutions of Massachusetts, Maine, Colorado, New Hampshire, and South Dakota[60]—a fact that was not lost on the

---

[60] See Mass Const, art 85 ("Each branch of the legislature, as well as the governor or the council, shall have authority to require the opinions of the justices of the supreme judicial court, upon important questions of law, and upon solemn occasions."); NH Const, art 74 ("Each branch of the legislature as well as the governor and council shall have authority to require the opinions of the justices of the supreme court upon important questions of law and upon solemn occasions."); Me Const, art VI, § 3 ("The Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and

convention delegates. See 1 Official Record, Constitutional Convention 1961, p 1548. When first introducing the "upon solemn occasions" language, Delegate Marjorie McGowan explained how she understood its meaning:

> By a solemn occasion the constitution means some serious and unusual urgent need. It has been held to be such urgent need when either branch of the legislature having some action in view has serious doubts as to their power and authority to take such action under the constitution or existing statutes. [*Id*. at 1543.]

Delegate McGowan noted that this definition was taken from a Massachusetts case interpreting the phrase. *Id*., citing *In re Opinion of the Justices*, 290 Mass 601, 602 (1935) ("These words mean that the opinions can be required only when 'such questions of law are necessary to be determined by the body making the inquiry, in the exercise of the legislative or executive power entrusted to it by the Constitution and laws of the Commonwealth.' 'By a solemn occasion, the Constitution means some serious and unusual exigency. It has been held to be such an exigency when . . . either branch of the Legislature, having some action in view, has serious doubts as to their power and authority to take such action, under the Constitution, or under existing statutes.' ") (citations omitted).[61]

Because the phrase "upon solemn occasions" had acquired a particular meaning in the law by this time, I believe it is a legal term of art describing the circumstances in which this Court may properly exercise its discretion to issue an advisory opinion. See *People v Law*, 459 Mich 419, 425 n 8 (1999) ("A legal term of art is a technical word or phrase that has acquired a particular and appropriate meaning in the law."). And, while

---

upon solemn occasions, when required by the Governor, Senate or House of Representatives."); SD Const, art 5, § 5 ("The Governor has authority to require opinions of the Supreme Court upon important questions of law involved in the exercise of his executive power and upon solemn occasions."); Colo Const, art VI, § 3 ("The supreme court shall give its opinion upon important questions upon solemn occasions when required by the governor, the senate, or the house of representatives; and all such opinions shall be published in connection with the reported decision of said court.").

[61] See also *Questions Submitted by the House of Representatives with Answers of the Justices*, 95 Me 564, 566-567 (1901) ("The questions submitted at the present time are undoubtedly important questions of law[;] it therefore becomes necessary to determine if they were submitted upon a solemn occasion. It has been said that this language of the Constitution means some serious and unusual exigency, such an exigency as exists when the body making the inquiry, having some action in view, has serious doubts as to its power and authority to take such action under the Constitution or under existing statutes.").

we are not bound by later decisions from other state courts interpreting the phrase, I believe some of those, too, are instructive. See, e.g., *In re Opinion of the Justices*, 815 A2d 791, 794 (Me, 2002) ("The following guideposts assist our determination on whether a 'solemn occasion' has been presented on an 'important question[ ] of law.'  First, the matter must be of 'live gravity,' referring to the immediacy and seriousness of the question."); *In re Daugaard*, 884 NW2d 163, 167 (SD, 2016) ("In determining whether a request for an advisory opinion presents a solemn occasion, the Court weighs . . . whether the question presents issues pending before the Court, . . . whether alternative remedies exist, whether the facts and questions are final or ripe for an advisory opinion, the urgency of the question, . . . and whether the Court has been provided with an adequate amount of time to consider the issue.").

As these decisions recognize, the original meaning of the phrase "upon solemn occasions" was "some serious and unusual urgent need," and the timing of the request is an important consideration in determining whether the request was made on a "solemn occasion."  This language was understood by the delegates as providing the Court wide discretion in choosing whether or not to issue an advisory opinion.[62]

The second phrase of Article 3, § 8 relating to when an advisory opinion may be requested provides that a request must be made "after [the legislation] has been enacted into law but before its effective date."  Thus, the provision expressly restricts the chronological time period in which such a request may be made.  By direct implication, the phrase also restricts this Court's power to issue an advisory opinion to cases in which the request is timely made.  For the following reasons, however, I do not believe that this phrase can fairly be understood as placing a direct, jurisdictional limitation on this Court's ability to issue an advisory opinion after the effective date of the legislation under review.

First, that is not what the provision says, nor do I think it reasonable to imply such a rule from the text.  The grammatical structure of this provision gives us an important clue as to why this timing requirement does not apply to issuance of the Court's opinion.

---

[62] As Delegate Eugene Wanger explained: "What these words do is give the court sound legal doctrine for hanging their hat on in refusing to give an opinion. . . .  In exercising restraint, . . . opinions [of other states' courts] construe the words 'solemn occasions' to authorize their refusal . . . in answering these questions."  1 Official Record, Constitutional Convention 1961, pp 1548-1549.  Delegate Robert Danhof similarly stated: "[I]t is upon those words 'solemn occasion' that [the Supreme Court] ha[s] the right to turn [a request] down and they will turn it down when they don't want to do it, which we would imagine would be most of the time, and because of that, they use that to state, no, this is not a solemn occasion, even though we might have an important question of law."  *Id*. at 1549.

In the text, the word "opinion" (the object of the sentence) is modified by three adjectival prepositional phrases—"of the supreme court," "on important questions of law," and "as to the constitutionality of the legislation." The first answers the question of which court may issue such an opinion—only this Court. The second two phrases limit the subject matter of advisory opinions to "important questions of law . . . as to the constitutionality of legislation." These limitations are directly connected to any advisory opinion that may be issued by this Court. The remaining two phrases in the text ("upon solemn occasions" and "after [the legislation] has been enacted into law but before its effective date") are adverbial prepositional phrases that modify the verb: "may request." Ordinarily, therefore, we would interpret these phrases as describing when the subject of the sentence ("[e]ither house of the legislature or the governor") may undertake the action permitted (requesting an advisory opinion). However, as noted above, "upon solemn occasions" is a legal term of art that provides this Court with wide discretion in choosing whether or not to issue an advisory opinion. Thus, while perhaps inartly drafted, this phrase was clearly intended to relate to the Court's power to issue an advisory opinion. But there is no similar reason to disregard the grammatical structure of the sentence as it relates to the "effective date" phrase—that provision is directly connected to and limits when a request can be made. By direct implication, it also restricts this Court's power to issue an advisory opinion to cases in which the request is timely made. But there is simply nothing in the text of this provision to indicate that it also limits when this Court may issue its opinion.

Moreover, I would not lightly infer that the provision establishes a jurisdictional deadline for issuance of the Court's opinion in the absence of express language. Indeed, because placing such a deadline on the Court would be so extraordinary, "one would normally expect it to be explicitly decreed rather than offhandedly implied."[63] Nor would this be the most natural reading of the provision—it would be strange for a provision to impliedly impose the same deadline for two sequential events by two different constitutional actors. That is not typically how deadline provisions are drafted, and with

---

[63] Scalia, *A Matter of Interpretation: Federal Courts and the Law* (New Jersey: Princeton University Press, 1997), p 29. Notably, the one state constitution I found that contains timing requirements for issuance of a court's advisory opinion does so expressly. Cf. Fla Const, art IV, § 1(c) ("The governor may request in writing the opinion of the justices of the supreme court as to the interpretation of any portion of this constitution upon any question affecting the governor's executive powers and duties. The justices shall, subject to their rules of procedure, permit interested persons to be heard on the questions presented and *shall render their written opinion not earlier than ten days from the filing and docketing of the request, unless in their judgment the delay would cause public injury*.") (emphasis added); Fla Const, art IV, § 10 ("The justices . . . shall render their written opinion no later than April 1 of the year in which the initiative is to be submitted to the voters pursuant to Section 5 of Article XI.").

good reason—the time period for the second actor (here, the Court) would vary depending on the expedition of the first. And, in any event, such a strained reading is unnecessary—as I noted above, the phrase "upon solemn occasions" provides this Court with wide discretion to take into account a number of considerations in deciding whether to grant or deny a request for an advisory opinion, including timing. Lastly, and as a further aid in determining the public understanding of this provision, it is worth noting that this Court has frequently issued advisory opinions after the effective date of the act at issue, including in the period immediately after ratification.[64]

I am unpersuaded by Justice CLEMENT's analysis because I do not believe she provides adequate textual support for her conclusion that the effective date deadline also was intended to apply to issuance of the Court's opinion. "Those who suggest that the meaning to be given a provision of our constitution varies from a natural reading of the constitutional text bear the burden of providing the evidence that the ratifiers subscribed to such an alternative construction." *Michigan United Conservation Clubs v Secretary of State (After Remand)*, 464 Mich 359, 376 (2001) (YOUNG, J., concurring). I do not believe Justice CLEMENT has met this burden. First, it appears no delegate at the constitutional convention ever mentioned that he or she understood the effective date deadline as barring the Court from issuing an advisory opinion after the legislation's effective date.[65] Second, while language suggesting this understanding did find its way into the Address,[66] that language was added in a late amendment right before the Address was approved, so it is questionable how well it reflects the delegates' understanding of the provision.[67] In any event, the more important inquiry is the effect this provision of

---

[64] See *ante* at 19 n 35 (CLEMENT, J., concurring).

[65] In this sense, it was like the watchdog that did not bark in the famous Sherlock Holmes novel, i.e., the absence of a fact that one would expect to see. Conan Doyle, "Silver Blaze," *Memoirs of Sherlock Holmes* (New York: Harper & Bros, 1894), pp 22, 26. See also *Mich Coalition*, 498 Mich at 326-327 (noting the absence of references of "pensions" or "retirement" during the constitutional convention debates as further support for its conclusion that the phrase "rates of compensation" in Const 1963, art 11, § 5 was not commonly understood to include them).

[66] The Address to the People states, in pertinent part, that the Court may issue advisory opinions only "before [the legislation at issue] become[s] effective." 2 Official Record, Constitutional Convention 1961, p 3368.

[67] We have also recognized that in the hierarchy of permissible extrinsic evidence, the Address to the People should take precedence over the debates. See *Mich Coalition*, 498 Mich at 323-324 ("The Address to the People, which was distributed to Michigan citizens in advance of the ratification vote and which explained in everyday language what each provision of the proposed new Constitution was intended to accomplish, and, *to a lesser*

the Address had on the common understanding of the people who ratified the Constitution. As for them, it is well to remember that they voted on and approved the language of the Constitution, not the language of the Address. As we have previously recognized, "the actual language of the proposed constitution constitutes the best evidence of the 'common understanding[.]' " *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 561 n 4 (2007), quoting *Studier v Mich Pub Sch Employees' Ret Bd*, 472 Mich 642, 652 (2005). And, while the Address may be a relevant consideration, it cannot be used to contradict the unambiguous language of the Constitution. See *Nat'l Pride At Work, Inc*, 481 Mich at 80. In my view, the errant phrase in the Address is insufficient to overcome the textual and historical clues as to the meaning of Article 3, § 8 that are discussed above.

I also disagree with Justice CLEMENT's interpretive approach because she relies upon extrinsic circumstances to determine the purpose of the provision, which violates a fundamental tenet of textualism. Although extrinsic sources may be used to help us determine the original meaning of the words and phrases in the text, see *Citizens Protecting Michigan's Constitution*, 503 Mich at 61; *Dist of Columbia v Heller*, 554 US

---

*degree*, the constitutional convention debates are also relevant to understanding the ratifiers' intent.") (cleaned up; emphasis added). This is because the Address to the People was approved by the delegates and was distributed prior to ratification. See, e.g., *Regents of Univ of Mich v Michigan*, 395 Mich 52, 60 (1975) ("The reliability of the 'Address to the People . . . lies in the fact that it was approved by the general convention on August 1, 1962 as an explanation of the proposed constitution. The 'Address' also was widely disseminated prior to adoption of the constitution by vote of the people.").

Interestingly, the proof of the Address to the People, which was mailed to the delegates on June 26, 1962, states only that the new section "empowers the supreme court to furnish advisory opinions to the governor and each house of the legislature on important questions of law and on solemn occasions," and refers to the unconstitutional use tax. Proof Copy, Address to the People, p 23, available at <https://babel.hathitrust.org/cgi/pt?id=mdp.39015071175999&view=1up&seq=25> (accessed December 5, 2019) [https://perma.cc/AQ52-VYGG]. The language Justice CLEMENT refers to was inserted along with scores of other changes in a later amendment that was proposed by the Committee on Public Information. However, these changes were not mailed to the delegates until July 27, 1962, only four days before the Address was approved. 2 Official Record, Constitutional Convention 1961, p 3301. The language, which was one of 112 proposed nonsubstantive amendments to the Address to the People, was not discussed by the delegates before its adoption. *Id*. at 3301-3311. The only explanation as to why the amendment was proposed is a brief note in the Official Record—"for clarification." *Id*. at 3303. Therefore, I question whether the amended language is entitled to the elevated consideration normally given to the Address.

570, 605 (2008), they should not be used to determine what the original drafters intended based on the mistaken notion that "because they were Framers . . . their intent is authoritative and must be the law[.]"  Scalia, *A Matter of Interpretation: Federal Courts and the Law* (Princeton, NJ: Princeton University Press, 1997), p 38.[68]  Instead, "[t]he purpose of a law must be 'collected chiefly from its words,' not 'from extrinsic circumstances.' "  *King v Burwell*, 135 S Ct 2480, 2503 (2015) (SCALIA, J., dissenting), citing *Sturges v Crowninshield*, 17 US 122, 202 (1819).  Similarly, in his seminal treatise, Justice COOLEY recognized that intent "is to be found in the instrument itself" rather than extrinsic sources.[69]  We have reaffirmed this principle on more than one occasion.  See, e.g., *City of Lansing v Lansing Twp*, 356 Mich 641, 649-650 (1959) ("No intent may be imputed to the legislature in the enactment of a law other than such is supported by the face of the law itself.  The courts may not speculate as to the probable intent of the legislature beyond the words employed in the act.").[70]  Not surprisingly, we have

---

[68] See also Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St Paul: Thomson/West, 2012), p 56 (noting, in distinguishing "textualist interpretation and so-called purposive interpretation," that textualists insist, among other things, that "the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires").

[69] Cooley, Constitutional Limitations (1st ed), p 55; see also *id*. ("It is to be presumed that language has been employed with sufficient precision to convey [the intent], and unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it."); *id*. at 55 n 3 (discussing Justice Greene Bronson's remarks "showing the impolicy and danger of looking beyond the instrument itself to ascertain its meaning, when the terms employed are positive and free from all ambiguity"), citing *People v Purdy*, 2 Hill 31, 35 (NY, 1841) (BRONSON, J., dissenting), rev'd 4 Hill 384 (NY, 1842).

[70] Citing *Mich Coalition*, 498 Mich at 325-326, Justice CLEMENT incorrectly asserts that "we have *explicitly authorized* looking to 'extrinsic circumstances to determine the purpose of' constitutional provisions."  *Ante* at 3 n 3 (CLEMENT, J., concurring).  However, no such authorization appears in the text of the Court's opinion or is even implicit in the interpretive work we did in that case.  See *Mich Coalition,* 498 Mich at 323-327 (using historical sources not to determine the purpose of Const 1963, art 11, § 5, but instead to confirm the Court's textual interpretation of the original meaning of one phrase in that provision, "rates of compensation").  Although we have stated in *Mich Coalition* and elsewhere that in construing constitutional provisions, "the court should have regard to the circumstances leading to their adoption and the purpose sought to be accomplished," see, e.g., *Kearney v Bd of State Auditors*, 189 Mich 666, 673 (1915), as the authorities cited above make abundantly clear, the purpose of the provision must be derived from its text, see *id*. at 672-673.  Properly understood, then, we should only have regard to the circumstances leading to the adoption of the Constitution if those

recognized that it is error to "focus[]on the history behind [a constitutional provision] and the intent of the constitutional convention delegates in proposing it, rather than on the interpretation that the people would have given the provision when they adopted it."[71]

---

circumstances help us to discover the common understanding of the words and phrases in the provision at the time of ratification. *Citizens Protecting Michigan's Constitution*, 503 Mich at 61.

[71] *Studier*, 472 Mich at 651-652. In her dissent in *Musselman v Governor*, 448 Mich 503 (1995), which this Court cited with approval in *Studier*, Justice RILEY explained why this is so:

> While the majority does attempt to substantiate its conclusion . . . by looking to the intent of the framers of the provision, such an examination is improper because, as stated by Justice COOLEY in [*Twitchell v*] *Blodgett*, [13 Mich 127, 166 (1865)], "the light to be derived from an examination of the proceedings of constitutional conventions, on questions of constitutional construction, is commonly vague and inconclusive, and not to be allowed, in any case, to control the meaning of unambiguous terms." He further stated:

>> If, however, by an examination of these proceedings, we had succeeded in ascertaining definitely the intent of the convention, we might still be far from the intent of the people in adopting their work. That intent should be gathered from the words embraced by the instrument as adopted, if those words are free from doubt. The people, in passing upon it, looked only to the clauses as they then stood, without troubling themselves with the considerations, or the accidental circumstances, that may have brought them to their present form.

>> Justice COOLEY then concluded that if the constitution expresses a natural meaning which, upon the first impression . . . strike[s] the mind on reading the clause . . . then further examination, with a view to find some other and more subtle meaning, ought to be made with extreme caution, lest we deceive ourselves into disregarding the plain and obvious sense for some other, which only ingenuity discovers and suggests. [*Musselman v Governor*, 448 Mich 503, 528-529 (1995), on reh 450 Mich 574 (1996) (RILEY, J., dissenting) (citations omitted).]

Having derived the purpose from an improper source, Justice CLEMENT also errs in the way she uses it. A purpose properly derived from the text may be used as follows:

> The subject matter of the document (its purpose, broadly speaking) is the context that helps to give the words meaning—that might cause *draft* to mean a bank note rather than a breeze. And even beyond that, it can be said more generally that the resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over the resolution that frustrates its purpose. [Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St Paul: Thomson/West, 2012), p 56.]

Justice CLEMENT does not use the purpose of the provision to give meaning to a particular word or to resolve an ambiguity in a manner that does not frustrate the purpose of the provision. Instead, she interprets the provision by focusing on " 'the mischief designed to be remedied . . . .' " *Ante* at 16 (CLEMENT, J., concurring), quoting *People ex rel Drake v Mahaney*, 13 Mich 481, 497 (1865). This interpretive approach, known as the "mischief rule," is generally synonymous with purposivism.[72] It has been sharply criticized, and rightly so. See, e.g., Jordan, *Legislative History and Statutory Interpretation: The Relevance of English Practice*, 29 USF L Rev 1, 6 (1994) ("[T]he mischief rule has also been criticized as unduly subjective, authorizing the courts, in the words of one Lord Justice, to engage in 'redrafting with a vengeance.' ").[73] Instead, while extrinsic circumstances may be relevant as an aid in discerning the common understanding of a legal text, that history may not be used to identify the problem the provision was designed to remedy so the provision may be construed only to mitigate that

---

[72] See *Reading Law*, p 433 (defining the "mischief rule" as "[t]he interpretive doctrine that a statute should be interpreted by first identifying the problem (or 'mischief') that the statute was designed to remedy and then adopting a construction that will suppress the problem and advance the remedy," and characterizing the mischief rule as "a primarily British name for purposivism"); *id.* at 438 (noting that "[b]roadly speaking, *purposivism* is synonymous with *mischief rule*").

[73] I recognize, of course, that Justice COOLEY authored *Mahaney* and that he appeared to utilize the "mischief rule" in that case. He did so, however, only after examining the text of the constitutional provision and determining that it did not preclude the action at issue. See *Mahaney*, 13 Mich at 496 ("We are unable to see how this conflicts with the provision referred to."). To the extent he looked outside the text for "[t]he mischief designed to be remedied" in *Mahaney*, he clearly rejected this interpretive approach in his later work on the subject. See Cooley, Constitutional Limitations (1st ed), p 55.

problem in the absence of textual support for such a narrow reading.[74]

       I agree that timing is an important consideration for the Court in deciding whether to grant or deny a request for an advisory opinion; however, I do not believe the Court is precluded from issuing an advisory opinion after the effective date of the legislation at issue. For the reasons stated in Justice ZAHRA's dissenting statement, I believe the requests from the House and Senate at issue here were submitted upon a solemn occasion and that we should grant the requests and issue an advisory opinion despite the fact that the public acts in question have already taken effect.

---

[74] See *Oncale v Sundowner Offshore Servs, Inc*, 523 US 75, 79 (1998) (noting that "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed").



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 18, 2019



t1218

Clerk